STANLEY M. BUGNO *et al.*, Plaintiffs-Appellees, v. MT. SINAI HOSPI-
TAL MEDICAL CENTER, Defendant-Appellant.

First District (1st Division)   No. 1—88—3406

Opinion filed May 14, 1990.

Lord, Bissell & Brook, of Chicago (Harold L. Jacobson and Hugh C. Griffin, of counsel), for appellant.

Drumke & Patterson, Ltd., of Chicago (Robert B. Patterson and Danielle M. Jaeschke, of counsel), for appellees.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Stanley and Elaine Bugno (plaintiffs) brought a medical malpractice action against Mt. Sinai Hospital Medical Center (Mt. Sinai) and Dr. Prahled Pyati for injuries sustained by Stanley as a result of Mt. Sinai's and Dr. Pyati's negligent treatment of his leg fracture. Prior to trial, Dr. Pyati settled plaintiffs' claims for $375,000. Following a jury trial, the jury returned a verdict against Mt. Sinai and awarded plaintiffs $3,500,000 in damages. The judgment was thereafter reduced to $3,084,035.38 by the $375,000 settlement amount tendered to plaintiffs by Dr. Pyati and by the additional sum of $40,964.62, pursuant to the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1205), which represented 50% of the unreimbursed medical, hospital and lost-time benefits paid to plaintiffs by others. Mt. Sinai appeals from this judgment and seeks a new trial. Mt. Sinai presents the following issues on appeal: (1) whether the trial court erred in admitting an exhibit as demonstrative evidence; (2) whether the trial

court erred in explaining the plaintiffs' burden of proof to the jury; (3) whether Mt. Sinai was denied a fair trial where the trial court limited a witness' testimony; and (4) whether the trial court erred in its instructions to the jury. We affirm.

On October 2, 1980, Stanley was treated at Mt. Sinai for a fractured left ankle. Because Stanley's ankle was swollen, a molded "temporary cast," which did not completely encircle the leg was applied to the ankle. The exposed portion of the leg was wrapped in an "Ace" bandage. At the emergency room doctor's request, Stanley returned to Mt. Sinai on October 6, 1980, at which time he was examined by Dr. Pyati, an orthopedic surgeon, and Dr. Brian Wood. Dr. Pyati ordered that Stanley remain in the "temporary cast" because his ankle was still swollen and that he return to Mt. Sinai's Cast Clinic on October 10, 1980. On October 10, 1980, Stanley returned to Mt. Sinai, at which time Dr. Pyati ordered that a short walking cast be applied to Stanley's lower left leg and that he return to the hospital in four weeks.

Stanley returned to Mt. Sinai on October 17, 1980, complaining that he suffered discomfort in his left leg and foot and that the heel of his cast had "crumbled." Casting room technician Luis Leonardo trimmed Stanley's cast at the top near his calf, at the bottom near his toes, and repaired the cast's crumbled heel.

After continued discomfort in his left leg and foot, Stanley telephoned Dr. Pyati on October 20, 1980. Dr. Pyati requested that Stanley return to Mt. Sinai's Cast Clinic on its next business day, October 22, 1980. After examining Stanley's leg on October 22, Doctors Pyati and Wood diagnosed Stanley as suffering from deep vein thrombosis (DVT), a blood clotting condition in his left calf directly underneath the cast. Stanley was subsequently admitted to Mt. Sinai, and his cast was removed. To avoid blood clotting, Dr. Pyati prescribed Heparin, an anticoagulant, and ordered a venogram test, which evidenced no blood clots. On November 1, 1980, Stanley suffered a stroke.

At trial, plaintiffs adduced the following additional evidence. Dr. Virginia Ambrosini, an internal medicine specialist, and Stanley's attending physician at Mt. Sinai, testified that a stroke occurs when an individual's artificial blood supply to the brain becomes occluded and that Stanley's treatment rested upon whether his stroke was thrombotic or embolic. A thrombotic stroke occurs when an individual has an arteriosclerotic growth causing a blockage in one of the branches of the left cartoid artery which leads to the brain. No evidence of arteriosclerosis was noted by Dr. Ambrosini from the results of

Stanley's brain flow study performed in November 1980. An embolic stroke occurs when a piece of foreign material, usually a blood clot, "let[s] loose" from somewhere in the body and lodges in a vessel blocking the flow of blood to the brain. Dr. Ambrosini opined that the clot which caused Stanley's stroke was a paradoxical embolus which originated in Stanley's left leg and traveled from the venous system through a patent foramen ovale[1] in Stanley's heart into the arterial left cartoid circulation system and then to the brain.

The testimony of Dr. Norman Kohn, Stanley's treating neurologist at Mt. Sinai, Dr. David Lubell, Stanley's treating cardiologist at Mt. Sinai, Dr. Donald Miller, an orthopedic surgeon and plaintiffs' expert witness, and Dr. Pyati concurred with the above testimony.

Dr. Muhammad M. Ilahi, a neurologist and Stanley's treating physician, testified that when he performed an ultrasound test on the major arteries of Stanley's neck in 1986 to determine whether Stanley suffered from an arteriosclerotic condition, or plaque in the arteries, the ultrasound disclosed no arteriosclerosis. He further testified that arteriosclerosis is a progressive disease and that Stanley could not have suffered from the disease in 1980 since there was no evidence of arteriosclerosis in 1986.

Dr. Kohn's testimony was substantially similar to the testimony given above by Dr. Ilahi.

Dr. James Talano, a cardiologist at Northwestern Memorial Hospital in Chicago, testified that in his expert opinion Stanley did not suffer from cerebral arteriosclerosis, cartoid arteriosclerosis, clots in the heart, or abnormalities in the mitral and aortic valves. He further testified that no pathology or abnormality of the left heart, the left chambers, the aorta or great vessels existed. Dr. Talano opined that the cause of Stanley's stroke resulted from a "clot that originated in [Stanley's] leg that paradoxically went across the septum."

Regarding the cause of the blood clot, Dr. Miller testified that the tightness of Stanley's cast caused the DVT. Dr. Miller further testified that Stanley had a simple noncomminuted fracture in his left lateral malleolus and that a cast should not place pressure on the blood vessels in an extremity.

Dr. Miller also testified that Dr. Pyati's and Leonardo's conduct was below the applicable standard of care because they failed to remove Stanley's cast after repeated complaints by Stanley of discomfort, swelling and discoloration. Dr. Miller opined that had the cast

---

[1]The record discloses that 35% of the population have a patent foramen ovale between their heart's chambers.

been removed, Stanley's stroke would not have occurred.

In order to illustrate the manner in which the cast appeared on October 10, October 12, and October 17, 1980, before and after it was trimmed and repaired, plaintiffs were allowed to utilize as demonstrative evidence group exhibit No. 1, which consisted of exhibits 1A, 1B and 1C. Group exhibit No. 1 consisted of a large, poster-size drawing of the lower portion of a leg with overlays depicting different variations of the manner in which the cast and Stanley's leg appeared over a period of time. Different colors were used to depict swelling and discoloration of Stanley's leg. The drawings were prepared by a medical artist based upon descriptions given him by Stanley and Elaine Bugno, Mary Ann Bugno, Richard Zolna, and Bernadette and Joseph Jarosz. Zolna and the Jaroszes attended a party with Stanley on October 12, 1980, and were therefore familiar with the condition of his leg. Exhibit 1A depicted discoloration and swelling subsequent to the cast's application on October 10, 1980. Exhibit 1B depicted the condition of the cast prior to its repair on October 17, 1980. Exhibit 1C depicted the appearance of Stanley's casted leg subsequent to his October 17, 1980, hospital visit.

Plaintiffs, Mary Ann Bugno, Richard Zolna, and Joseph and Bernadette Jarosz testified to the accuracy of exhibit 1A. Plaintiffs and Mary Ann Bugno testified to the accuracy of exhibits 1B and 1C.

Mt. Sinai presented two witnesses to rebut Dr. Miller's opinion. Dr. Pyati testified that he was unable to offer any opinion as to whether a tightly applied, short-leg walking cast where the skin is swollen and overhanging falls below the applicable standard of care to cast clinics. He stated that when he applies a cast, he makes certain that it is not too tight; that in a "normal" patient there should be no overhanging flesh; that when a cast is properly applied a finger should be able to be inserted between the cast and the skin; that if a cast is so tight that it immobilizes the venous blood flow, a blood clot can form and the cast should be removed; that if a doctor observes a tightly applied cast as depicted in plaintiffs' group exhibit 1, he should bival the cast and remove it; and that failure to remove the cast would constitute conduct which falls below the applicable standard of care.

Dr. Robert Thompson, an orthopedic surgeon, testified on behalf of Mt. Sinai as an expert witness. Dr. Thompson testified that he was unfamiliar with the standard of care applicable to Chicago-area cast rooms in October 1980. Stanley developed DVT in his left leg because he sustained a fracture, which was properly casted, causing immobilization and because he was overweight and smoked ciga-

rettes. He further testified that even if Stanley's cast was applied too tightly, it was unrelated to the development of DVT. On cross-examination, Dr. Thompson testified that if a finger cannot be inserted between the cast and the patient's skin the cast has been applied too tightly and that a tightly applied cast should be closely monitored every other day by the doctor.

On appeal, Mt. Sinai first contends that it was denied a fair trial when the trial court permitted plaintiffs to utilize prejudicial freehand drawings depicting the condition of Stanley's leg from October 10, 1980, to October 17, 1980. Mt. Sinai argues that the exhibits are "subjective, argumentative, plaintiff-slanted, and misleading." Mt. Sinai describes group exhibit No. 1 as follows: The top of the cast is depicted as being so tight that it caused the flesh at the top of the cast to severely swell and grossly bulge out over the top of the cast. The swollen portion of the leg was colored purple to give the appearance of tightness and compression. The bottom of the cast was drawn so that it appeared to fit flush up against the bottom of the toes, which were also drawn to appear extremely swollen, puffy and purple.

While the admission of demonstrative evidence is within the discretion of the trial, such evidence must help explain some relevant issue in the case. (*Smith v. Ohio Oil Co.* (1956), 10 Ill. App. 2d 67, 77, 134 N.E.2d 526, 530.) To curtail abuses, however, such a determination is subject to review as to the actual use made of the object. (*Smith*, 10 Ill. App. 2d at 77, 134 N.E.2d at 530-31.) If the exhibit is utilized for dramatic effect, or emotional appeal, rather than factual explanation useful to the reasoning of the jury, reversible error may result, not because of abuse of discretion, but because the actual use of the exhibit proved to be an abuse of the ruling. *Smith*, 10 Ill. App. 2d at 77, 134 N.E.2d at 531; see also *Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353, 392 N.E.2d 1; *Schaffner v. Chicago & North Western Transportation Co.* (1987), 161 Ill. App. 3d 742, 515 N.E.2d 298, *aff'd* (1989), 129 Ill. 2d 1, 541 N.E.2d 643; *Joynt v. Barnes* (1979), 71 Ill. App. 3d 187, 388 N.E.2d 1298.

We find that group exhibit No. 1 helps explain the relevant issue of causation. The medical artist depicted Stanley's leg based upon descriptions provided him by plaintiffs' witnesses, Mary Ann Bugno, Richard Zolna and Joseph and Bernadette Jarosz. In fact, the drawings were edited until they fully complied with the witnesses' descriptions. The above witnesses testified respectively as to the accuracy of group exhibit No. 1 from their personal observations as to the manner in which Stanley's leg appeared on October 10, October

12, and October 17, 1980. Generally the witnesses verified that group exhibit No. 1 accurately depicted their personal observations at the time of their observations. Mt. Sinai never challenged the witnesses' testimony on cross-examination, nor did it present any evidence to rebut the accuracy of the drawings. After considering the witnesses' testimony, we conclude that the trial court did not err in finding the drawings were necessary to aid the jury in its understanding the adduced testimony. For brevity's sake, since much of the testimony overlaps, we find it unnecessary to set forth each witness' testimony in detail.

■■ Moreover, we disagree with Mt. Sinai's argument, that the drawings were utilized for dramatic effect or emotional appeal. So long as "demonstrative exhibits [are] relevant and actually explanatory, *** courts have *** allowed the exhibits regardless of their emotional effects." (*Foster v. Devilbiss Co.* (1988), 174 Ill. App. 3d 359, 365, 529 N.E.2d 581, 585.) Because the conditions of swelling, discoloration and the degree of tightness of Stanley's cast depicted in the drawings were highly relevant to Mt. Sinai's liability here, it was proper for the jury to be afforded a visual aid by which to more fully understand the witnesses' testimony.

■■ Mt. Sinai next contends that the trial court committed reversible error during *voir dire* by misstating the law as to plaintiffs' burden of proof. During *voir dire* the trial court stated the following to the jury panel:

"It might be an opportune time to explain the different questioning of what we call the burden of proof.

The person who brings the action has the burden of proving the case.

In the civil case it is by a greater weight of the evidence, no matter how slight. In a criminal case for those who may have had a chance to sit on a criminal case and read the paper about what the greater weight or what the burden of proof is, the criminal case is beyond a reasonable doubt.

In this case that is not the test. In this case it would be by a greater weight of the evidence. An example, if you visualize a scale which is unbalanced and it is tipped even that much, the person who—the person or persons who bring the action has carried that burden of proving their case.

Now, that does not mean that the other party cannot overcome that, but just for that purpose so there is no question in your mind about that."

Mt. Sinai argues that it was prejudiced by the above statement be-

cause the trial court's reference to the slight tilting of the scales of evidence could only have served to minimize, in the minds of the jurors, plaintiffs' evidentiary burden. Mt. Sinai further argues that the trial court misstated the law by suggesting that Mt. Sinai had the burden to overcome plaintiffs' evidence. While we agree with Mt. Sinai that the trial court erred in minimizing plaintiffs' burden of proof, we find any error to be harmless.

Mt. Sinai directs our attention to the recent decision in *Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 33, 541 N.E.2d 643, 656-57, where our supreme court disapproved the "scale of justice" illustration and the reference that the evidence need only be "slight" in explaining to the jury a plaintiff's burden of proof in a civil case. In *Schaffner*, the court found the error to be harmless because the trial court, in explaining to the prospective jurors the distinction between civil and criminal standards of proof, gave both an account that has been disapproved as favoring plaintiffs, as well as an account that has been disapproved as favoring defendants. The jury, in *Schaffner*, also was correctly instructed on the plaintiff's burden of proof by means of Illinois Pattern Jury Instructions, Civil, No. 21.01 (2d ed. 1971) (hereinafter IPI Civil 2d No. 21.01).

Similarly, the alleged error here is harmless in nature because the jury received an instruction in the form of IPI Civil 2d No. 21.01, as to the meaning of the burden of proof in a civil case. Thus, any possibility that the jury was misled or prejudiced by the trial court's remarks during *voir dire* was alleviated.

■ Mt. Sinai also argues that the trial judge's statements concerning the differences in proof required in criminal and civil proceedings was inconsistent with Supreme Court Rule 234 (107 Ill. 2d R. 234), concerning the *voir dire* examination of prospective jurors. Rule 234 states, "Questions shall not directly or indirectly concern matters of law or instructions." (107 Ill. 2d R. 234.) Mt. Sinai asserts that the comments to the jurors pertaining to the differing standards of proof violated that provision. Again relying on *Schaffner*, we do not interpret Rule 234 as narrowly as the interpretation afforded to it by Mt. Sinai. The rule further states, "[t]he court may acquaint prospective jurors with the general duties and responsibilities of jurors." (107 Ill. 2d R. 234.) The trial judge's comments were intended to serve the above purpose. Regardless, any error arising from the trial judge's remarks did not prejudice Mt. Sinai because the jury was properly instructed on plaintiffs' burden of proof prior to their deliberations.

Mt. Sinai next contends that it was not afforded a meaningful rebuttal of plaintiffs' expert witness, Dr. Miller. We disagree.

During cross-examination, Dr. Miller was questioned regarding a treatise that he co-authored with Dr. David Abramson, a vascular specialist. The treatise contains a passage, written by Dr. Abramson, which supports Mt. Sinai's theory that if a clot occurred, it was the result of "physical inactivity [or] immobilization of the limb as by a cast." Dr. Miller testified that they erroneously omitted to include a firm, tight cast as one of the possible causes of a blood clot.

■ Mt. Sinai was permitted to call Dr. Abramson as a rebuttal witness to impeach Dr. Miller's testimony that he and Dr. Abramson omitted that a "firm, tight cast" may cause blood clotting. Plaintiffs objected to his rebuttal testimony on the grounds that it would constitute an improper violation of the expert witness disclosure requirements under Supreme Court Rule 220 (107 Ill. 2d R. 220). Consequently, Dr. Abramson was limited to stating that no omissions were made in the treatise on the possible causes of blood clots and precluded from offering his opinion on the accuracy of the treatise.

The trial court was justified in limiting Dr. Abramson's testimony here. Dr. Abramson was permitted to rebut Dr. Miller's testimony. Any additional testimony from Dr. Abramson would have constituted an expert opinion as to the proper casting of Stanley's leg and cause of Stanley's blood clot in violation of Supreme Court Rule 220 (107 Ill. 2d R. 220).

■ Finally, Mt. Sinai contends that the trial court erred in permitting the jury to consider in plaintiffs' issues instruction, plaintiffs' liability theory premised upon Mt. Sinai's failure to provide Stanley adequate instructions concerning signs and symptoms of adverse changes in his left leg. Mt. Sinai argues that allowing such consideration by the jury was reversible error because there was no evidence by which to support a causal connection between the lack of instructions and Stanley's injury.

A plaintiff is entitled to have the jury instructed on every theory supported by the evidence. (*In re Estate of Loesch* (1985), 134 Ill. App. 3d 766, 771-72, 481 N.E.2d 32, 36; *Ralston v. Plogger* (1985), 132 Ill. App. 3d 90, 98, 476 N.E.2d 1378, 1383; see also *Darby v. Checker Co.* (1972), 6 Ill. App. 3d 188, 285 N.E.2d 217; *Schomer v. Madigan* (1970), 120 Ill. App. 2d 107, 255 N.E.2d 620.) Elaine Bugno testified that on October 2, 1980, a temporary cast was applied to Stanley's left leg and the only instructions that Stanley received from Mt. Sinai was that he elevate his leg. Dr. Pyati testified that each patient was to receive instructions when he received a cast, but

that he had no independent recollection of whether Stanley received instructions as to the care and precautions that Stanley should have been aware of at the time his permanent cast was applied on October 10, 1980. Dr. Pyati further testified that his practice is to give oral instructions to patients as follows: that they keep the leg elevated; that they observe the toes and leg for swelling, discoloration, and the inability of movement; and that they take note of any unusual pain. If any of the above symptoms persist after elevating the leg, the patient is advised to return to the hospital.

Dr. Wood testified that it was the practice of Mt. Sinai technicians to instruct patients on the general care of the cast, whether it be "weight bearing, nonweight bearing," to avoid bumping the cast on anything, and in the event that the cast loosens or becomes too tight, to return to the hospital.

Plaintiffs' expert testified that the applicable standard of care here required explicit instructions to be given to Stanley, preferably in writing, and that the instructions should advise the patient to report any problems to the doctor, specifically those concerning swelling, discoloration or pain. As previously set forth, Dr. Thompson testified that he was unfamiliar with the applicable standard of care in Chicago cast clinics.

Based upon our review of the evidence, we hold that the liability theory at issue here was sufficiently supported by the evidence and therefore properly placed before the jury.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAMPBELL and O'CONNOR,* JJ., concur.

---

*Justice Manning recused herself from the cause after oral argument.