JOHN J. FLYNN, JR., *et al.*, Plaintiffs-Appellants, v. ANDRE EDMONDS, Defendant-Appellee.

Fourth District   No. 4—91—0792

Opinion filed October 29, 1992.

774

STEIGMANN, J., specially concurring.

Alexandra de Saint Phalle, of Londrigan, Potter & Randle, P.C., and James C. Craven, of James C. Craven, P.C., both of Springfield, for appellants.

Delmer R. Mitchell and Gena J. Awerkamp, both of Schmiedeskamp, Robertson, Neu & Mitchell, of Quincy, for appellee.

JUSTICE LUND delivered the opinion of the court:

Plaintiffs appeal a judgment entered upon a jury verdict in favor of defendant in an action for medical malpractice before the circuit court of Adams County. Recovery was premised on defendant's al-

leged negligence in delaying treatment of complications arising from a dislocated elbow. We affirm.

On December 17, 1985, John Flynn, Jr. (Flynn), fell off a stool and dislocated his elbow. He was treated in the emergency room at St. Mary's Hospital by Dr. Edmonds, who then issued instructions for care and discharged Flynn. Dr. Edmonds examined the arm again on the following afternoon and, finding no problem, sent him home. The pain and swelling of a dislocated elbow normally begins to subside within 24 to 48 hours. But, on December 19, Flynn's condition worsened. Mrs. Flynn exchanged telephone calls with Dr. Edmonds and was told to loosen his bandage. Although he did not think it was necessary, Dr. Edmonds advised Mrs. Flynn that he would meet her at the emergency room if she insisted. Late that evening, she took her husband to the emergency room where he was examined by Dr. Kuhlman. Dr. Kuhlman then called Dr. Edmonds and described his findings, whereupon the two doctors decided to admit Flynn for observation. Orders were given to check Flynn every two hours and notify Dr. Edmonds of any change in his condition.

A somewhat rare, but potentially catastrophic complication of any elbow dislocation is a condition known as a "compartment syndrome." It is caused when swelling within the fascia, or the compartment which envelops the muscles, becomes so severe that the flow of blood is cut off, causing damage to nerves, blood vessels, and muscles within the compartment. At the time of Flynn's injury, the only way to diagnose compartment syndrome was through observation of a consolidation of signs and symptoms sometimes referred to as the six "P's": pain out of proportion to the injury, pallor, paralysis, paresthesia (numbness), polar (cold to the touch), and pulselessness. The only treatment for compartment syndrome is a fasciotomy, where the compartment lining is split down the length of the arm, allowing the swollen muscle to spill out. The wound is allowed to stay open, often for several days, until the swelling decreases. Fasciotomy is a mutilating surgery that poses an increased risk of infection due to the fact that the wound is allowed to remain open for so long.

During the second examination on December 18, 1985, Dr. Edmonds found no sign of compartment syndrome. On the evening of the 19th, the emergency room physician found that Flynn was able to move his fingers, sensation was intact, and pulse and circulation were good. The upper arm was quite swollen, with visible bruising and blisters caused by the swelling. There were no definite signs of compartment syndrome other than increased pain, and Dr. Kuhlman testified that this pain was not out of proportion to the injury.

At 3 a.m., defendant called to check on Flynn's condition and was given no reason to come in to see him. At 6 a.m., the record indicates that Flynn's condition appeared to be improving. At 8 a.m., Flynn's family physician, Dr. Westerhoff, stopped by for a social visit. He observed that Flynn's condition was deteriorating and believes he probably told the nurse that Dr. Edmonds should be contacted.

Dr. Edmonds had planned to see Flynn at 8 a.m. that day, until he received a call from Blessing Hospital advising him that his 9 a.m. surgery had been rescheduled for 8 a.m. Although the surgery was relatively straightforward and elective in nature, the procedure was unavoidably delayed until 9:30 a.m. Defendant was not alerted to Flynn's condition until this surgery was in progress. Dr. Edmonds immediately called Dr. Westerhoff and, after discussing Flynn's condition, alerted the St. Mary's staff to prepare for surgery on Flynn. He arrived at St. Mary's at about 10 a.m. and found that Flynn's pulse in the injured arm was only detectable by "Doppler." Flynn could still move his fingers and had normal sensation, but he had increased swelling in his neck, chest wall, and upper arm. Dr. Edmonds planned surgery within the next half hour and contacted Dr. Bitter, a vascular surgeon, to assist. Dr. Bitter was already involved in an elective surgery when he received the call from Dr. Edmonds, so surgery on Flynn was delayed until he could arrive, at 12:15 p.m. The fasciotomy only lasted 30 minutes and successfully preserved the viability of all muscle tissue in the arm. Unfortunately, circulation to the arm was reestablished only with great difficulty—the vascular surgery lasted 4½ hours.

Plaintiffs' principal claim is that if the fasciotomy had been performed earlier, there would have been no need for the extensive vascular surgery. Dr. Edmonds' delay in detecting the compartment syndrome, combined with the subsequent delay while waiting for Dr. Bitter to finish his elective surgery, caused Flynn to suffer significant deterioration of his condition, resulting in repeated surgical procedures to restore circulation to his arm. Plaintiffs also claim Dr. Edmonds breached the standard of care by not admitting Flynn after the initial examination. The jury found in favor of defendant, plaintiffs' post-trial motion was denied, and this appeal follows.

## I. REFUSAL TO DECLARE A MISTRIAL

Plaintiffs' first argument is that the trial court erred in refusing to grant a mistrial during *voir dire* when, in response to questioning from the trial judge, a juror answered as follows:

"Well, the only concern I have is when you use the term substantial damages. If it turns into hundreds of thousands of dollars, because of my knowledge of malpractice insurance costs, I have a little bit of a feeling that it's not really, maybe it's—."

Plaintiffs' counsel claims that juror Jurrens' mention of insurance in connection with medical malpractice was highly prejudicial and affected the jury panel. At the time Jurrens made her remark, eight jurors had already been selected and were no longer present in the courtroom.

Plaintiffs rely on *Maddox v. Smith* (1966), 67 Ill. App. 2d 374, 214 N.E.2d 5, for the principle that a mistrial should be granted if a prospective juror expresses derogatory remarks about persons seeking recovery from insured defendants. In *Maddox*, a prospective juror had, in a prior case, delivered a diatribe lasting several minutes regarding plaintiffs who filed suits against insured defendants. One or more of the jurors in the prior case also served on the jury in the *Maddox* case, and Maddox's counsel claimed that, had he known this, he would have called for a mistrial. The *Maddox* court acknowledged that a mistrial was warranted in the prior case. In regard to their own case, the *Maddox* court recognized the difficulty of any observant person to ignore the direct and implied pressures in favor of or against personal injury claims. The court held that, absent any specific showing to the contrary, members of a jury will be presumed to faithfully perform their duties of fairness and impartiality to the best of their ability. *Maddox*, 67 Ill. App. 2d at 383, 214 N.E.2d at 9.

The single comment made by Jurrens does not rise to the level of a diatribe lasting several minutes. The trial court carefully explained to Jurrens that the amount of damages is determined solely by the jury. When asked if she could sign a verdict for substantial damages if the jury decided it was fair, she responded that she could.

The traditional rule is that it is always improper to inform the jury, directly or indirectly, that the defendant is insured against liability. (*Kitsch v. Goode* (1977), 48 Ill. App. 3d 260, 362 N.E.2d 446.) In recent years, though, courts have demonstrated an increasing tolerance toward references to insurance. The rule in Illinois is that a mistrial is not appropriate where the subject of insurance is introduced by an isolated, inadvertent, or unresponsive reference by someone other than plaintiff's counsel where there is no apparent intent to prejudice the defendant. (*Kitsch*, 48 Ill. App. 3d at 266, 362 N.E.2d at 451; *Williams v. Consumers Co.* (1933), 352 Ill. 51, 185 N.E. 217.) The cases which have found prejudicial error due to the mention of insurance have involved some misconduct, improper remarks or ques-

tions of counsel calculated to influence or prejudice the jury. (*Mondelli v. Checker Taxi Co.* (1990), 197 Ill. App. 3d 258, 554 N.E.2d 266.) Since the record shows no indication of misconduct by counsel, the trial court's denial of the motion for mistrial was fully justified.

## II. REFUSAL TO EXCUSE JURORS

Plaintiffs next argue that the trial court created reversible error by forcing them to exhaust their peremptory challenges on jurors who should have been discharged for cause. Plaintiffs were denied challenges for cause as to jurors Lohmeyer, Schutte, Junkerman, and Jurrens, and used peremptories to exclude them. Plaintiffs argue that had the court ruled properly and excluded these jurors for cause, then they would have had sufficient peremptories left over to exclude jurors Ruffcorn and Jones. A challenge for cause against Ruffcorn and a request for an additional peremptory to excuse Jones were both denied.

The principle governing our review of a trial court's ruling on a challenge to a juror for cause originates in the Haymarket Square riot case, *Spies v. People* (1887), 122 Ill. 1, 12 N.E. 865. The decision holds that a trial court's ruling on a challenge for cause will only be reviewed when *an objectionable juror* was forced upon the party after it had exhausted its peremptory challenges:

> " 'Unless objection is shown to some one or more of the jury, who *tried* the case, the antecedent rulings of the court upon the competency or incompetency of jurors, who have been challenged and stood aside, will not be inquired into in this court.' " (Emphasis in original.) *Spies*, 122 Ill. at 257-58, 12 N.E. at 989, quoting *Holt v. State* (1880), 9 Tex. App. 571, 580.

We therefore turn our attention to the two jurors plaintiff was forced to accept.

### A. *Juror Ruffcorn*

Ruffcorn's son was undergoing treatment by another orthopedic surgeon, Dr. Holt, at defendant's clinic. Despite Ruffcorn's acknowledgement that he could be fair to everyone and follow the law given by the court, plaintiffs claim any rational juror would be legitimately concerned that a verdict against Dr. Edmonds would make subsequent treatment by Dr. Holt unpleasant. In support, plaintiffs cite *Nelson v. Monroe Regional Medical Center* (7th Cir. 1991), 925 F.2d 1555, an action for antitrust and intentional infliction of emotional distress. In *Nelson*, the clinic where plaintiff's doctor practiced merged with another local clinic. Plaintiff had sued one of the doctors at the other

clinic for malpractice. Soon after the merger, the clinic advised plaintiff that she would no longer be able to receive treatment from them. The *Nelson* case, involving a clinic's retaliation against a patient who sued them, has no relevance to the case at hand.

When asked if it is possible that Dr. Edmonds would be called in to cover for Dr. Holt if he was unavailable, Ruffcorn replied that he did not know, but he would guess that Dr. Gilchrist would take his place. According to defense counsel, defendant's clinic has three orthopedic surgeons on its staff and Dr. Holt's office is not located in the same building as defendant's office. Ruffcorn said he did not believe there would be any repercussions against him or his son if he sat as a juror in this case. Overall, Ruffcorn's responses under questioning portrayed him as a model juror. Plaintiffs contend that the court erred in denying their challenge for cause, and since prior erroneous rulings on juror challenges had exhausted their peremptories, they were forced to accept this allegedly objectionable juror.

The determination of whether a prospective juror possesses the state of mind which will enable him to give an accused a fair and impartial trial rests in the sound discretion of the trial judge. His determination should not be set aside unless it is against the manifest weight of the evidence. (*People v. Cole* (1973), 54 Ill. 2d 401, 414, 298 N.E.2d 705, 712.) The burden of showing that the juror possesses a disqualifying state of mind is on the party challenging the juror. (*Cole,* 54 Ill. 2d at 413, 298 N.E.2d at 712.) The *Cole* decision is the leading case in Illinois addressing considerations to be made in determining if a prospective juror should be dismissed for cause. However, our court, in *Marcin v. Kipfer* (1983), 117 Ill. App. 3d 1065, 1068, 454 N.E.2d 370, 372, made the following statement:

> "Our decision is consistent with the following statement of an experienced authority on Illinois trial procedure:
>> 'The trend of authority is to exclude from juries all persons who by reason of their business or social relations, past or present, with either of those parties, could be suspected of possible bias \*\*\*.' Hunter, Trial Handbook for Illinois Lawyers sec. 15.14 (5th ed. 1983)."

(See also *People v. Green* (1990), 199 Ill. App. 3d 927, 930, 557 N.E.2d 939, 941.) In *Marcin,* it was held error to allow patients of the defendant doctor to sit as jurors.

Plaintiffs ask that we extend the holding in *Marcin,* claiming that potential bias is not limited to the single physician-partner being sued, particularly when the partners work within the same medical specialty. *Marcin,* as mentioned above, held the patient-physician rela-

tionship to be inherently biased for purposes of jury selection. Plaintiffs also claim that the court, by discharging prospective jurors who had outstanding accounts with QP&S Clinic and who acknowledged bad experiences with a doctor, acknowledged inherent prejudicial relationships similar to the Ruffcorn relationship.

■ We decline to extend the *Marcin* holding to the present facts. The trial court's denial of the motion to dismiss Ruffcorn for cause was tantamount to a finding that he was not objectionable, not prejudicial to the plaintiff. We hold that determination was not against the manifest weight of the evidence.

### B. *Juror Jones*

Plaintiffs did not challenge Jones for cause, but asked the court to consider all the previous challenges that were denied and allow an additional peremptory to exclude Jones. They claim that Jones admitted that he would be hesitant in awarding damages for pain and suffering. Also relevant is the fact that Jones' son had seen Dr. Edmonds on a few occasions seven or eight years earlier for treatment of sports injuries. Jones stated his son's earlier treatment would not give defendant any advantage and claimed he had no hesitancy about granting a verdict in favor of plaintiffs. Regarding Jones' willingness to award damages for pain and suffering, the record states:

"[Plaintiffs' counsel]: [D]o you have any problems with the idea that a patient or person involved in an automobile accident is able to come into court and ask for damages not only for medical expenses but also for pain and suffering that might be in excess of the actual medical expenses and loss?

MR. JONES: I have got no problems if they come in and ask for that.

[Plaintiffs' counsel]: *** You mentioned you have got no problems, that they come and ask for it. Would you have difficulty in awarding it?

MR. JONES: I wouldn't, I would not have difficulty awarding it if the evidence so said that. I guess my hesitation here is the frequency and the amount of liabilities that this country is going through right now.

[Plaintiffs' attorney]: *** [I]f you were sitting in the Flynns' position, and you were in my position, picking, trying to select fair and impartial jurors, would you consider yourself a fair and impartial juror for the Flynns?

MR. JONES: I believe so.

[Plaintiffs' attorney]: If you were sitting in their seats?

MR. JONES: I believe so."

■ The fact that Jones, in a single comment, expressed some concern about damage awards does not outweigh his clear expressions of impartiality and his specific willingness to award damages according to the evidence heard. Jones' awareness of high damage awards is shared by virtually all potential jurors.

A party asserting reversible error must provide a clear showing of prejudice. (*Schaffner v. Chicago & North Western Transportation Co.* (1987), 161 Ill. App. 3d 742, 515 N.E.2d 298, *aff'd* (1989), 129 Ill. 2d 1, 541 N.E.2d 643.) The record does not indicate Jones was objectionable or prejudicial. As stated above, a trial court's ruling on a challenge for cause will only be reviewed when an *objectionable* juror was forced upon the party after its peremptory challenges have been exhausted. (*Spies*, 122 Ill. at 257-58, 12 N.E. at 989.) Examination of the *Spies* opinion requires "objectionable" to mean a juror who should have been dismissed for cause—one who would prejudice the case. As neither Ruffcorn nor Jones fits this definition of "objectionable," we find there is no need to address alleged errors in prior challenges for cause.

III. DUTY TO DISCLOSE "FRAUD UPON A TRIBUNAL"

Next, plaintiffs argue that defense counsel's conduct in withholding knowledge that plaintiffs' expert witness had perjured himself warrants a new trial. At the discovery deposition, plaintiffs' sole expert witness, Dr. Palmaccio, testified that he had just recently taken the examination to become a board-certified orthopedic surgeon. He claimed he had never taken the exam before and was waiting for the results.

During their preparation for trial, defense counsel decided to check Dr. Palmaccio's credentials and contacted the American Board of Orthopedic Surgery (Academy). (Evidently the American Board of Orthopedic Surgeons is the same entity as the American Academy of Orthopedic Surgeons.) They learned that Dr. Palmaccio had taken the exam in 1979 and 1980, and had failed the exam both times. He applied to take the exam again in 1981, but failed to appear. He also took the exam in 1990 and was notified two months prior to his deposition that he had failed. Defense counsel then secured an affidavit from the executive director of the American Academy of Orthopedic Surgeons, Dr. Donald Kettlekamp, in order to confront Dr. Palmaccio if he tried to lie at trial. Cross-examination of Dr. Palmaccio indicates a possibility that defense counsel also secured transcripts or excerpts from transcripts of three other trials where Dr. Palmaccio

had testified that he had never taken the exam prior to 1990. Plaintiffs' counsel was not furnished with any discovery information regarding the perjured testimony.

In their opening statement, defense counsel urged the jury to listen to what the expert witnesses tell them about such things as board certification and credibility, asking them to focus on who is believable and who is coming in to tell the truth. During plaintiffs' direct examination, Dr. Palmaccio was asked if he was board certified, and he replied that he had recently passed the examination he took in the last year and was waiting to take the oral portion in order to complete his certification. He also testified that this was the first time he had taken the exam. On cross-examination, defense counsel had Dr. Palmaccio repeat his testimony regarding certification and then asked if it was true that he had failed the test three times. Dr. Palmaccio denied it, explaining later that he had signed up for the exam a number of times but never sat for the exam prior to 1990.

After objection from plaintiffs' counsel, and during a conference outside the presence of the jury, defense counsel offered to prove up his accusations with an affidavit obtained from the Academy. The affidavit was deemed hearsay and insufficient for impeachment purposes. Defense counsel then assured the court he would have the requisite record keeper available for rebuttal purposes. Based on these assurances, the trial court allowed the cross-examination to proceed. Later, over plaintiffs' objection, defense counsel called Dr. Kettlekamp of the Academy to testify Dr. Palmaccio had taken and flunked the board certification exam three times.

Before we proceed further, we emphasize that defense counsel's cross-examination had, before the impeachment questions, made harmful inroads into the testimony of plaintiffs' expert. The trial judge described Palmaccio's testimony while ruling on a motion for directed verdict:

> "THE COURT: [H]e's testified as to standard of care, and he's also testified—Quite frankly, he was all over the board, as a matter of fact. He gave us more than one standard of care, I think, and he also indicated that at one time the delay in putting Mr. Flynn in the hospital right away was a deviation, and then another time he testified he wasn't sure if that could have caused the damage or not. Quite frankly, he was not a strong witness."

Plaintiffs claim that defense counsel's failure to notify the trial court of the perjured deposition testimony violated Rule 1.2(h) of the Illinois Rules of Professional Conduct (Rules), which states:

"A lawyer who knows that a person other than the client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal." 134 Ill. 2d R. 1.2(h).

"Fraud," as defined in the Rules terminology section, is conduct "having a purpose to deceive and not merely negligent misrepresentation or failure to apprise another of relevant information." (134 Ill. 2d, Illinois Rules of Professional Conduct, Terminology, at 472.) Plaintiffs argue that defense counsel's behavior compromised the integrity of the court and created a prejudicial inference that plaintiffs were fostering perjury. Plaintiffs contend that justice, based upon both moral and ethical grounds, requires that evidence of Dr. Palmaccio's perjury should necessarily have been furnished to plaintiffs' counsel. As this was not done, plaintiffs were deprived of a fair trial. An emphasis is placed upon defense counsel's *knowing* that the perjury would take place.

Plaintiffs concede that there is no Illinois case directly on point, but offer a Federal case as persuasive authority, *In re Grievance Committee of United States District Court, District of Connecticut* (2d Cir. 1988), 847 F.2d 57. The case involved a plaintiff's attorney whose client warned him that a defense witness planned to perjure himself at his pretrial deposition. According to the client, the witness told him before the deposition that he was instructed by defendant's attorney to change his story. A few months after the deposition, the client told his attorney of another conversation with the witness where he admitted that he had indeed perjured himself at the deposition. Approximately one year later, the substance of these conversations was brought to the attention of the trial judge. The matter was referred to a grievance committee to investigate whether plaintiff's attorney had violated Disciplinary Rule 7—102(B)(2) of the Code of Professional Responsibility, which provided that a " 'lawyer who receives information clearly establishing that: *** [a] person other than his client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal.' " *Grievance*, 847 F.2d at 58 n.1, quoting Code of Professional Responsibility DR 7—102(B)(2).

The court held that the rule only applies when the lawyer has *actual knowledge* of the fraud and, in that case, the attorney only had suspicion of wrongdoing. The decision is significant because the court presumed, without addressing the issue, that perjury during a discovery deposition constitutes a fraud on a tribunal. The issue is only addressed in a concurring opinion where the judge writes:

"Untruthful testimony by a witness, which has not been suborned by his lawyer, does not, standing alone, constitute fraud

upon the court. [Citations.] This is particularly true where, as here, the testimony is given during a pretrial deposition. Until the deposition is placed in evidence, it does not become part of the case before the court." (*Grievance*, 847 F.2d at 64 (Van Graafeiland, J., concurring).)

Defendant argues that perjury at a discovery deposition does not constitute "fraud upon a tribunal," as in Rule 1.2(h) (134 Ill. 2d R. 1.2(h)).

■■ We agree with defense counsel that Rule 1.2(h) does not require an attorney to disclose the *possibility* that a witness might lie on the stand. Counsel could not know for certain that the witness would continue to lie after being put under oath in an Illinois courtroom. Nor could they know that under a stringent cross-examination focused on his board-certification credentials, the witness would continue to stick by his testimony. However, as any trial lawyer should readily admit, defense counsel had to be hoping for exactly this result.

Any defense counsel, in situations such as this, is in a difficult position. If they disclose the impeaching information before trial, they can rest assured that the falsely testifying witness will never appear or will testify truthfully on the point that could be subject to impeachment. That is not to say that the same witness will be equally candid with the balance of his testimony.

Trials are an attempt to get to the truth of contested matters, and a falsely testifying witness will be a serious obstruction on the road to truth. Realizing the serious harm that may be done when a situation such as this occurs, we conclude that the burden of obtaining truthful witnesses should rest upon those who are calling those witnesses. From our respective experience as trial judges and private attorneys, we are aware that some in the various professions are willing to testify more for reasons of monetary gain than for the benefit of justice. Truth, then, can lose out. We conclude that defense counsel was not in violation of discovery or ethical rules in representing his client as he did and recognize defense counsel's cross-examination brought the fraud to the court's attention.

Plaintiffs contend that while verification of board certification is easily obtained, the perjury in this case concerned a qualifying exam—not the actual certification. Qualifying exams, it is argued, are not public information. Plaintiffs suggest that defendant, in his status as a board-certified orthopedic surgeon, may have had access to information which would not be available to them. As such, plaintiffs were denied an equal opportunity to verify Dr. Palmaccio's credentials.

■ At the outset, it must be noted that the record contains no indication that plaintiffs ever tried to verify Dr. Palmaccio's credentials. Plaintiffs support their contention of unequal access to information with an excerpt from the American Medical Association Directory of Graduate Medical Education Program (1989) (AMA Directory), which seems to weigh against their position. According to the excerpt in plaintiffs' brief, a general but factual statement will be provided indicating the location of an applicant within the examination process on a need-to-know basis. Accordingly, plaintiffs could possibly have discovered that Dr. Palmaccio had provided false information. He was deposed on October 8, 1990, and said he had just taken the exam for the first time and was waiting for results. Dr. Kettlekamp testified that over two months earlier (on July 27, 1990) Dr. Palmaccio was notified that he had failed. If the citation to the AMA Directory is applicable to Academy certification of orthopedic surgeons, then Dr. Palmaccio's location within the application process appears to have been available.

Plaintiffs also cite *Marrese v. American Academy of Orthopaedic Surgeons* (7th Cir. 1984), 726 F.2d 1150, as further proof that Dr. Palmaccio's records were unavailable. In *Marrese*, the Academy rejected plaintiff's membership without a hearing or statement of reasons. Plaintiff filed an antitrust action in Federal district court and, in discovery, asked the Academy to produce its files relating to denials of membership applications. The request was denied and the Academy was held in contempt. On appeal, the court upheld the Academy's refusal to provide the records, reasoning that the involuntary disclosure of deliberations on membership applications would undermine the voluntary character of an association and therefore harm worthy interests. The threshold question is whether the Academy would similarly decline to confirm whether a prospective member had passed the written portion of the examination process. The issue is not addressed and, for our purposes, the case seems to stand only for the proposition that the Academy should not be required to offer a hearing or state reasons for denying membership.

Plaintiffs cite *Metlyn Realty Corp. v. Esmark, Inc.* (7th Cir. 1985), 763 F.2d 826, for the proposition that parties and counsel have an obligation not to deceive the court and to correct statements they know to be false. In *Metlyn*, an expert witness for Esmark made misstatements on the stand. On appeal, it was claimed that Esmark had perpetrated a fraud upon the court, even though it was conceded that counsel had no knowledge of the expert's misstatements. The court held that Esmark was not required to vouch for its witness. Plaintiffs

also cite *People v. Bartee* (1991), 208 Ill. App. 3d 105, 566 N.E.2d 855, for the notion that a duty to avert perjury arises before the testimony is offered in court. The case deals with an attorney who refused to question his client on the stand, as he thought it likely he would perjure himself. Both cases are distinguishable from the present case, where the complaining party was responsible for putting the witness on the stand.

■ Finally, plaintiffs cite Rule 3.3(a)(5) of the Rules, which prohibits a lawyer from participating in the creation or preservation of evidence which the lawyer knows or reasonably should know is false. (134 Ill. 2d R. 3.3(a)(5).) Plaintiffs argue that concealment of Dr. Palmaccio's perjury amounted to preservation of evidence known to be false. The result of defense counsel's conduct was to expose dishonest testimony. We find no violation of Rule 3.3(a)(5).

IV. ALLEGED ERROR IN ALLOWING UNDISCLOSED
REBUTTAL WITNESS TO TESTIFY

Plaintiffs next argue that the trial court erred in allowing an undisclosed expert witness to testify. Over plaintiffs' objection, the court allowed Dr. Kettlekamp to impeach Dr. Palmaccio's testimony concerning his credentials. Plaintiffs contend that defendant violated Supreme Court Rule 220 (134 Ill. 2d R. 220), which mandates the disclosure of all expert witnesses at least 60 days before trial.

Dr. Kettlekamp testified at length on the requirements of Academy certification, including the fact that in spite of a 90% pass rate, Dr. Palmaccio had failed three times. As Dr. Kettlekamp possessed specialized knowledge about the requirements for board certification beyond that of the average person, plaintiffs argue that he qualifies as an expert under Rule 220. Rule 220 defines an expert as one who "possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation." 134 Ill. 2d R. 220(a)(1).

■ Dr. Kettlekamp's testimony was limited to board-certification testing procedures and requirements and Dr. Palmaccio's performance on those tests. As such, his testimony was not material to a claim or defense in the suit as required by Rule 220. Plaintiffs contend that a defendant's ability to criticize the qualifications of the plaintiff's expert is a key factor in his defense and, therefore, material to a claim or defense under Rule 220. We find plaintiffs' argument unconvincing. The fact that Dr. Kettlekamp gave no opinion on the underlying malpractice claim is a conclusive determination that he testified as a rebuttal witness, not a Rule 220 expert. As long as he confined his testi-

mony to impeachment of Dr. Palmaccio's credentials, defendant was not required to disclose Dr. Kettlekamp's identity under Rule 220. *Bugno v. Mt. Sinai Hospital Medical Center* (1990), 201 Ill. App. 3d 245, 559 N.E.2d 1.

Plaintiffs contend that even if Dr. Kettlekamp is found not to be an expert witness, failure to disclose that he would be called as a witness violated the pretrial order requiring that a list of each party's witnesses be provided prior to trial. Had Dr. Palmaccio testified truthfully on direct examination, there would have been no need to call Dr. Kettlekamp. The pretrial order did not require the parties to disclose a rebuttal witness.

### V. WHETHER PERJURED TESTIMONY OF PLAINTIFFS' EXPERT WITNESS WARRANTS A NEW TRIAL

■ Plaintiffs next argue that perjured testimony of plaintiffs' expert witness warrants a new trial. The general rule is that the trial court's decision on a motion for a new trial will not be reversed on appeal unless it affirmatively appears from the record that the trial court abused its discretion. (*Herington v. Smith* (1985), 138 Ill. App. 3d 28, 485 N.E.2d 500.) Plaintiffs cite *Quagliano v. Johnson* (1968), 100 Ill. App. 2d 444, 241 N.E.2d 187, for the rule that whenever perjured testimony so permeates the process as to constitute a fraud on the court, the false testimony alone may be sufficient to warrant a new trial. *Quagliano* deals with newly discovered evidence produced in conjunction with a party's post-trial motion that indicated the possibility of perjured testimony at trial. As such, the case is distinguishable from the case at hand, where the issue was fully aired at trial. The *Quagliano* court also notes that newly discovered evidence which serves only to impeach or discredit a witness does not constitute grounds for a new trial. *Quagliano*, 100 Ill. App. 2d at 449, 241 N.E.2d at 190.

Next, plaintiffs cite *Herington*, where a new trial was granted after it was found that defendant's expert witness lied about his credentials. *People v. Alfano* (1981), 95 Ill. App. 3d 1026, 420 N.E.2d 1114, is cited for the concept that false testimony need not relate to a material issue to fall into the field of fundamental unfairness and that due process is denied where the falsity occurs in testimony going to the credibility of a witness. Both of these cases deal with newly discovered evidence which came to light after the verdict was rendered, in contrast to the circumstances of the present case where the issue was fully aired during trial. Another distinguishing feature is that in both cases a new trial was granted to the party *against* whom the perjured

testimony was offered, while here the party who offered the perjured testimony is requesting relief.

Plaintiffs cite *Bullard v. Barnes* (1983), 112 Ill. App. 3d 384, 445 N.E.2d 485, *aff'd* (1984), 102 Ill. 2d 505, 468 N.E.2d 1228, for the proposition that harmful error may exist when improperly admitted evidence influences the verdict by an appeal to passion. Dr. Kettlekamp's rebuttal testimony was properly admitted. As such, *Bullard* is inapposite.

### VI. CHALLENGES TO TESTIMONY OF DEFENDANT'S EXPERT WITNESS ON STANDARD OF CARE

Plaintiffs next argue that the trial court erred in allowing defendant's expert, Dr. Eckenrode, to testify as to the standard of care, as this testimony was beyond the scope of his deposition and involved hearsay matters. Plaintiffs argue that at the time of Dr. Eckenrode's deposition, he had only treated two dislocated elbows. It is contended that this experience was insufficient to qualify him to testify as to the standard of care. We disagree.

### A. *Whether Defendant's Doctor Expert Was Permitted to Testify Beyond Scope of His Deposition Testimony*

Dr. Eckenrode testified at his deposition that there were, in effect, no *published* standards of care for orthopedic practice. But, when asked to give the standard of care for treating a dislocated elbow, he gave a detailed and specific response. Responding to a question regarding a particular aspect of compartment syndrome, he summarized the basis for his understanding of the standard of care:

> "As with all aspects of my practice, I depend not only on my personal experience but also my reading and my training from a lot of talented and experienced physicians who were my teachers. Obviously I don't rely on my experience only or just what I've read in books to be a physician or I could have skipped medical school and residency training and just gotten a book and started. But I use my experience, my training from the dozens or hundreds of teaches [*sic*] I've had and the literature to try and treat any problem including compartment syndrome."

■■ The only conclusion that may be drawn from a reading of the deposition is that Dr. Eckenrode is a qualified orthopedic surgeon possessing detailed knowledge of compartment syndrome and its treatment. Any argument that his trial testimony exceeded the scope of his deposition is based on the fact that Dr. Eckenrode initially be-

lieved that the term "standard of care" referred only to officially *published* guidelines. By the time of trial, it is apparent that he understood that his experience and qualifications allow him to testify regarding the standard of care, regardless of whether these standards have been officially published.

Plaintiffs cite two cases suggesting that experts cannot testify beyond the scope of their deposition. Neither is applicable to the facts now before us. In *Northern Trust Co. v. Upjohn Co.* (1991), 213 Ill. App. 3d 390, 572 N.E.2d 1030, *cert. denied* (1992), 502 U.S. 1095, 117 L. Ed. 2d 418, 112 S. Ct. 1172, it was held improper for an emergency room physician with no work experience in obstetrics or gynecology to testify against a defendant obstetrician. In *Wehmeier v. U N R Industries, Inc.* (1991), 213 Ill. App. 3d 6, 572 N.E.2d 320, we held a medical expert's expertise did not extend to knowledge of the ability of asbestos fibers to drift around inside a factory. Here, Dr. Eckenrode, an orthopedic surgeon specializing in the upper extremities, testified in regard to the work of another orthopedic surgeon.

### B. *Whether Qualifications of Defendant's Doctor Expert Are Limited to Those Possessed on Date of Injury*

■■ Plaintiffs also cite *Northern Trust* for the proposition that the expert must be familiar with the customary care at the actual time the treatment is offered. Since Dr. Eckenrode was still in his residency in 1985 and, at that time, had only seen two compartment syndromes, plaintiffs argue that he should not be allowed to testify to any knowledge or experience he subsequently gained. Plaintiffs contend that to rule otherwise would violate Rule 220(d) (134 Ill. 2d R. 220(d)), prohibiting an expert from testifying beyond the scope of his deposition. The argument is entirely devoid of substance, and the citation to *Northern Trust* is inexplicable. Dr. Eckenrode testified at his deposition and at trial that the treatment of compartment syndrome has remained unchanged since 1985.

*Northern Trust* establishes a two-part test to determine the admissibility of expert testimony offered to establish the standard of care. First, it must be shown that the expert is licensed in the same school of medicine to which the defendant doctor belongs. Second, the expert must demonstrate that he is otherwise qualified to give expert testimony on the case. (*Northern Trust*, 213 Ill. App. 3d at 406, 572 N.E.2d at 1040.) Both trial and deposition testimony make clear that Dr. Eckenrode easily met both these tests.

## C. *Trial Court's Alleged Refusal to Allow Plaintiffs to Cross-Examine Defendant's Expert Doctor*

■■ Plaintiffs also claim that the court erred by refusing to allow plaintiffs' counsel to cross-examine Dr. Eckenrode regarding his qualifications during direct examination. Actually, the court merely refused to allow plaintiffs' counsel to interrupt the direct examination. If an opposing party believes that the witness lacks sufficient qualifications for an anticipated opinion, the court may permit a preliminary cross-examination into the question of qualification. The decision to allow this preliminary cross-examination rests in the court's discretion and does not exist as a matter of right. (*Payne v. Murphy Hardware Co.* (1978), 62 Ill. App. 3d 803, 379 N.E.2d 817.) Plaintiffs were given full opportunity to cross-examine the witness' qualifications at the close of the direct examination. No error existed.

### D. *Admissibility of Testimony of Medical Records*

Finally, plaintiffs claim the court erred when it allowed Dr. Eckenrode to support his opinion as to standard of care with hearsay testimony. Before his deposition, Dr. Eckenrode reconfirmed his own opinion of the standard of care by checking the records of the last 11 patients treated for a dislocated elbow at his medical facility. He found that 7 of 11 of these patients were sent home to recover as had plaintiff. Those admitted to the hospital all had other problems, unrelated to their elbow dislocation, which made hospitalization necessary.

■■ Plaintiffs argue that since medical records of these 11 patients were not produced, they represent hearsay and testimony in reference to them should not have been allowed. The trial judge instructed the jury that evidence of the 11 patients was not being offered for its truth, but only to show the basis of the expert's opinion.

Plaintiffs cite *Kim v. Nazarian* (1991), 216 Ill. App. 3d 818, 576 N.E.2d 427, for the principle that an expert should not be allowed to parrot the corroborative opinions solicited from nontestifying colleagues. *Kim* involved a physician specializing in radiology passing X rays around to at least one other colleague and testifying that the others told him it was a normal X ray. Dr. Eckenrode did not consult other physicians. He merely reviewed case histories from medical records available at his own clinic.

For a physician to confirm his understanding of customary care through records of similar cases handled at his clinic appears to be lit-

tle more than a standard research technique. As such, we find that it satisfies the dictates of Federal Rules of Evidence 703 and *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, requiring data reasonably relied upon by experts in the particular field, and is consistent with the dictates of our supreme court's opinion in *Wilson*.

### E. *Examination of Patient Records: Standing to Raise Patient Privacy*

■■■ Plaintiffs next argue that Dr. Eckenrode's use of his medical group's records was a violation of privacy because there was no showing he had the consent of the patients to examine their records. Defendant persuasively argues that plaintiffs have no standing to raise this issue. Plaintiffs respond that standing is immaterial, because case law in Illinois holds that litigants are not entitled to obtain the records of other patients and that Eckenrode's use of his partners' records was a violation of those patients' privacy. (See Ill. Rev. Stat. 1991, ch. 110, par. 8—802.) In support, plaintiffs cite *Davis v. Hinde* (1986), 141 Ill. App. 3d 664, 490 N.E.2d 1049, where defendant requested the names of clients represented by plaintiff's attorney within the last three years who were also treated by plaintiff's physician. *Davis* involved the release of patient *names* in order to establish the existence of a business relationship between a law firm and a particular doctor in order to prove that the opinion of the testifying doctor was the natural result of his employment. The identities of patients included in the case histories used by Dr. Eckenrode were never divulged and are completely irrelevant to his testimony. As such, *Davis* has no relevance to this decision and we find that there has been no violation of patient privacy.

### F. *Sufficiency of Defendant's Expert's Testimony to Establish Standard of Care*

■■■ Citing *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279, plaintiffs contend that Dr. Eckenrode's testimony is without value because he testified as to what he would have done, not as to the standard of care. Medical malpractice proof requires evidence of a standard of care and a violation of that standard to justify reviewing. (*Walski*, 72 Ill. 2d at 256, 381 N.E.2d at 282.) Testimony of what another doctor would do is not sufficient. (*Walski*, 72 Ill. 2d at 261, 381 N.E.2d at 285.) We recognize that plaintiff was charged with showing the standard of care and its violation. (*Walski*, 72 Ill. 2d at 256, 381 N.E.2d at 282.) Dr. Eckenrode could not establish a standard of care inconsistent with that testified to by plaintiffs' expert by solely testi-

fying he would have done what defendant did. His testimony went far beyond what plaintiffs contend; it was highly detailed. Plaintiffs' contention is without merit.

### VII. Failure To Instruct On Aggravation
### Of A Preexisting Injury

Next, plaintiffs claim that the jury was improperly instructed. Plaintiffs argue that a preexisting injury instruction was needed to show the jury that plaintiffs' damages should not be reduced for injuries that cannot be attributed to Dr. Edmonds' negligence. As a result, jurors were not made aware that plaintiffs could recover for the "enhanced injuries" that resulted when the surgery was delayed.

■■ Plaintiff John Flynn's dislocated elbow represents the underlying reason for treatment with Dr. Edmonds. An instruction concerning the aggravation of a preexisting injury would not be applicable in this case because the alleged negligence related only to the necessary medical treatment required by the condition arising from a dislocated elbow.

### VIII. Refusal To Modify Issues And
### Burden Of Proof Instructions

■■ Similarly, plaintiffs objected to defendant's instruction No. 12, which states plaintiffs have the burden of proving that the negligence of defendant was a proximate cause of *the* injury to plaintiffs. Plaintiffs argue the instruction should read "an" injury, as opposed to "the" injury, in order to make certain the jury does not confuse the injury caused by falling from the stool with the injury caused by Dr. Edmonds' negligent treatment. We agree with the trial judge when he observed that the jury was sophisticated enough to know that plaintiffs were not blaming Dr. Edmonds for the fall from the stool.

### IX. Challenge To Verdict As Against Manifest
### Weight Of The Evidence

Finally, plaintiffs claim that the verdict is against the manifest weight of the evidence. Dr. Bitter, the vascular surgeon who joined Dr. Edmonds in treating Flynn's compartment syndrome, was asked on redirect examination if he would have needed to do all the vascular surgery if there had been a pulse before the operation started. Dr. Bitter replied, "Probably not." Plaintiffs claim this response provides undisputed expert testimony of both a standard of care that was breached and proximate causation of at least some injury. Defendant counters that Dr. Bitter's answer was not based on a reasonable medi-

cal certainty and was, therefore, insufficient to establish liability.

Defendant cites *Piano v. Davison* (1987), 157 Ill. App. 3d 649, 510 N.E.2d 1066, where the First District Appellate Court held that liability must be based on a showing of proximate cause which establishes a reasonable certainty that defendant's acts caused the injury. Plaintiffs inexplicably respond that this rule of law is waived because defendant did not object to the form of the question at trial. Plaintiffs further argue that the issue of reasonable degree of certainty is unnecessary, as long as the expert is basing his opinion on medical facts rather that engaging in speculation and conjecture. In support, plaintiffs cite *Coffey v. Brodsky* (1987), 165 Ill. App. 3d 14, 518 N.E.2d 638, a fourth district case involving a claim of *res ipsa loquitor* in medical malpractice. While it is true that an expert is not allowed to base his testimony on conjecture, nowhere does this decision suggest that the sole requirement for establishing liability through expert testimony is the absence of conjecture.

To prove negligence in a medical malpractice action, a plaintiff must show that the treatment he or she received deviated from the appropriate standard of care. (*Witherell v. Weimer* (1987), 118 Ill. 2d 321, 515 N.E.2d 68.) Defendant relies on testimony of Dr. Palmaccio, plaintiffs' expert witness, to support his contention that the verdict was not against the manifest weight of the evidence. Dr. Palmaccio agreed that he could not say that less of a fasciotomy would have been needed if the patient had been admitted to the hospital initially after his injury or if he had been seen earlier. Plaintiffs' complaint is founded on the fact that defendant should have admitted Flynn to the hospital at an earlier date or, in the alternative, seen him earlier on the day the fasciotomy was performed. Dr. Palmaccio's testimony provides evidence that defendant did not breach the standard of care. Where the evidence is conflicting, in order for a verdict to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly evident. (*Schaffner*, 161 Ill. App. 3d at 764, 515 N.E.2d at 311.) We find the verdict was not against the manifest weight of the evidence.

Affirmed.

GREEN, P.J., concurs.

JUSTICE STEIGMANN, specially concurring:

Although I agree with the result the majority reached, I do not

agree with its delicate handling of the perjury of plaintiffs' expert witness. The majority is much too grudging in concluding that defense counsel appropriately handled this liar. In my view, defense counsel did *everything* exactly right, and he should receive our congratulations without reservation.

The majority correctly points out that "[t]rials are an attempt to get to the truth of contested matters." (236 Ill. App. 3d at 785.) However, exposing perjurers in the courtroom is *at least* as important to the process of seeking the truth as is the presentation of truthful witnesses. Indeed, it may be even more important because of the institutional benefits that result: (1) liars might be deterred from taking the oath and perjuring themselves in open court; and (2) lawyers might more carefully select and investigate the witnesses they intend to put on the stand, so as to avoid the devastating consequences of calling a witness whose perjury is demonstrated before the jury.

Given the concerns of everyone involved in both civil and criminal cases about the frequency of perjury from the witness stand, I view the events in this case—and the predictable result—as nothing short of wonderful, and I am unwilling to join in any opinion that suggests *any* merit to the plaintiffs' whining.

Additionally, I disagree with the majority's emphasizing that defense counsel's cross-examination had already made inroads into the testimony of plaintiffs' expert witness before his perjury was demonstrated. The majority's emphasis suggests that had the expert witness' credibility not already been damaged, our assessment regarding his perjury might be different. In my judgment, revealing the expert witness' perjury is even more important if his testimony had been very helpful to the plaintiffs and *few* harmful inroads had been made by defendant.

Other than as indicated, I concur fully with the majority opinion.