# FOR PUBLICATION



**FILED**

Apr 17 2014, 8:45 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**BENJAMIN D. ICE**
**WILLIAM A. RAMSEY**
Murphy Ice & Koeneman LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES:

**ROBERT J. PALMER**
May · Oberfell · Lorber
Mishawaka, Indiana

**EDWARD J. CHESTER**
**LAURA L. EZZELL**
Chester Law Offices
Elkhart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| GEICO GENERAL INSURANCE COMPANY, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | )  No. 20A04-1307-CT-325 |
| | ) |
| LAURA B. COYNE, CHERYL A. O'MAILIA, and JAMES O'MAILIA, | ) |
| | ) |
| Appellees-Plaintiffs. | ) |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Evan S. Roberts, Judge
Cause No. 20D01-1009-CT-61

**April 17, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

GEICO General Insurance Company ("GEICO") appeals from the trial court's Findings of Fact and Conclusions of Law Addressing Plaintiff's Motion for a New Trial, entered on March 21, 2013, as well as from the court's Final Order entered on June 5, 2013, in favor of Cheryl A. O'Mailia and James O'Mailia (collectively, the "O'Mailias").[1] GEICO raises three issues, which we consolidate and restate as whether the court erred in awarding attorney fees to the O'Mailias based upon GEICO litigating in bad faith. Additionally, the O'Mailias request appellate attorney fees pursuant to Ind. Appellate Rule 66(E). We reverse and also deny the O'Mailias' request for appellate attorney fees.

FACTS AND PROCEDURAL HISTORY

On December 28, 2009, vehicles driven by Laura Coyne and Arlin Yoder were involved in an accident. Cheryl O'Mailia was a passenger in Coyne's vehicle, and she sustained physical injuries from the accident, including fractures of the second cervical vertibra, the seventh cervical vertibra, the sternum, multiple rib fractures, and the mid ulna on her left arm. At the time of the accident, the O'Mailias were insured by GEICO under a policy providing underinsured motorist coverage with a limit of $600,000. Cheryl brought a claim under the policy for damages sustained and James brought a claim under the policy for loss of consortium.

Approximately one week before trial, counsel for GEICO discovered on the Florida Department of Health's public website that James's medical license had come under investigation based on numerous allegations, including that he had forged

---

[1] We note that Laura Coyne is also listed as a party plaintiff. However, she was dismissed as a party by the trial court and does not participate in this appeal.

prescriptions for his wife (the "Florida Information"). The website noted that due to these allegations, the State of Florida arrested James on July 20, 2009, and charged him with thirteen counts of violating Fla. Stat. § 893.17(7)(a), by obtaining controlled substances by fraud. On September 1, 2009, James pled nolo contendere to five felony counts of violating Fla. Stat. § 831.02 by uttering a forged instrument. Also, on September 7, 2010, the Florida Surgeon General asked the Florida Board of Medicine to impose penalties including the revocation or suspension of James's medical license, and in January 2011 James entered into a settlement agreement under the terms of which he agreed to pay a $30,000 fine and reimburse the Department of Health costs of between $21,254.15 and $24,254.15, was prohibited from treating or prescribing medications to family members, and had his medical license placed on probation for three years.

GEICO did not alert the O'Mailias of the Florida Information it had found, and apparently the O'Mailias did not tell their counsel about the same. On October 31, 2012, a jury trial commenced, and on the second day of trial James testified regarding the accident's effect on him and his wife, as well as problems with his medical office. He testified that "had [his wife] not had the accident, I would suspect that this would have been nothing other than just a regular, American family – just trying to do the best we could." Transcript at 187. On cross-examination, the following exchange occurred:

Q.      But you said that before the accident you just had the problems of a
        regular, American family. Is that right?

A.      I think so. Yes.

Q.      Isn't it true that you guys had something else going on in your
        family that most families aren't dealing with?

3

A.      What are you alluding to?

Q.      You can't think of anything as you sit there?

A.      No, not that I can think of.  No.

Q.      Okay.  Isn't it true that on July 20th of 2009, you were arrested and charged in the Circuit Court of Leon County in Florida with thirteen counts of violating section 89 – or 893.137a of the Florida statutes by obtaining controlled substances by fraud?

Id. at 188.

The O'Mailias objected, and following a brief bench conference the court sent the jury out of the courtroom.  William Ramsey, counsel for GEICO, explained to the court that in Florida a conviction is entered following a plea of nolo contendere, that "fraud is a crime of dishonesty," and that accordingly "it fits squarely within 609(a)." Id. at 194.  Benjamin Ice, who was also counsel for GEICO, then explained that "the purpose of the question is that there is this whole issue that's going on, a stressor in this family that affects how they're relating to each other and stress and anxiety that [Cheryl] is experiencing," that "having your husband arrested and charged in a criminal court is a highly stressful ordeal," and that therefore "there is this purpose that's beyond impeaching him as having been convicted of a crime of dishonesty." Id.  The court then asked why this information was not disclosed, and Attorney Ice replied as follows:

> We looked very aggressively for any obligation to disclose it; there was none.  We knew that if we disclosed it there would be a whole preparation on getting around it.  This is substantive evidence.  There was no written discovery that called for this, there was – we're not using it as an exhibit, there was no obligation to disclose something that we found in a public record on the internet.

4

Id. at 194-195. The O'Mailias' counsel, Edward Chester, responded he "utterly and totally disagree[d] with everything Mr. Ice just said," that "[w]hat they've done is lay in ambush just like the lawyer did in *Outback Steakhouse*,"[2] and he moved for a mistrial. Id. at 195. The court recessed and met with the attorneys in chambers, and afterwards invited the attorneys to make a record on the issues of disclosure and the duty to disclose, as well as Ind. Evidence Rules 609 and 403. After the O'Mailias renewed their motion for a mistrial, Attorney Ice explained the decision to not disclose as follows:

> Our position when we discovered this – we tried to determine whether there was a duty to disclose. There were absolutely no written discovery requests to us at that point that required disclosure. Furthermore, there's nothing under the Trial Rules that required disclosure. We evaluated every obligation that was made on us either by the rules of this court, of this state, or the pleadings in this case; we determined there was no duty to disclose. We opted not to disclose that information. It is our position that there is no duty to disclose this information.
>
> By comparison is that in the same way that [the O'Mailias' counsel] is not going to share with me his cross examination of Dr. Horn in this case, I have no duty to provide my cross examination of Dr. O'Mailia in this case. . . .

Id. at 201. Attorney Ramsey also noted that although the court did not ask the attorneys to address Ind. Evidence Rule 404(b), it is relevant because that rule "recognizes that criminal convictions can be admissible for a variety of purposes other than impeachment purposes," that "it talks about the admissibility of crimes and requires disclosure in criminal cases," and that the implication is "there is no automatic disclosure requirement in a civil case." Id. at 204.

---

[2] Attorney Chester was presumably referencing the case of Outback Steakhouse of Fla., Inc. v. Markley, 856 N.E.2d 65 (Ind. 2006).

The court denied the O'Mailias' request for a mistrial, but it prohibited GEICO from asking questions about the licensing and criminal proceedings other than establishing the fact of a conviction for impeachment purposes under Ind. Evidence Rule 609(a). The jury ultimately entered judgment in favor of Cheryl on her claim in the amount of $225,000,[3] GEICO filed a motion to reduce judgment, and on November 14, 2012 the court entered an order granting the motion and entering judgment in favor of Cheryl in the amount of $125,000 plus post judgment interest effective November 2, 2012. James was not awarded damages on his loss of consortium claim.

On December 5, 2012, the O'Mailias filed a Motion for a New Trial based primarily on GEICO's failure to disclose and use of the Florida Information at trial and also requested attorney fees.[4] On December 10, 2012, GEICO filed a response to the O'Mailias' motion, and on December 31, 2012, the court held a hearing on the motion and asked for proposed findings and conclusions. On March 21, 2013, the court issued Findings of Fact and Conclusions of Law Addressing the O'Mailias' Motion for a New Trial (the "March 21 Order"), in which the court denied the O'Mailias' request for a new trial but granted their request for attorney fees based upon Ind. Code § 34-52-1-1(b)(3) for fees "associated with the time and expense associated with [the O'Mailias'] motion for a new trial, oral argument and proposed findings of fact tendered," and it ordered the

---

[3] Specifically, Cheryl was awarded $250,000, which was reduced by ten percent due to comparative fault on the part of Coyne.

[4] The motion also stated that GEICO's counsel improperly objected throughout pre-trial depositions and at trial, including during opening and closing argument, calling such objections a "calculated and deliberate pattern of misconduct . . . ." Appellant's Appendix at 77. The O'Mailias further argued that during a bench conference, GEICO's counsel "consistently, theatrically and vigorously shook his head in the negative in the presence of the jury when [the O'Mailias'] counsel responded to arguments made by GEICO's counsel." Id. at 78.

O'Mailias' counsel to file an affidavit with an attached itemized invoice pertaining to such work.[5] Appellant's Appendix at 50. The O'Mailias' counsel filed an affidavit on April 3, 2013, and on April 16, 2013, the court entered an order awarding attorney fees in the amount of $15,568.22. Following a temporary stay requested by GEICO, on June 5, 2013 the court issued its Final Order vacating the stay and confirming the award of $15,568.22.

### ISSUE / STANDARD OF REVIEW

The issue is whether the court erred in awarding attorney fees to the O'Mailias based upon GEICO litigating in bad faith. The court based its award of attorney fees on subsection (b) of Ind. Code § 34-52-1-1, also known as the General Recovery Rule, which provides:

> In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:
>
> (1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;
>
> (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or
>
> (3) litigated the action in bad faith.

Specifically, the court awarded attorney fees under Ind. Code § 34-52-1-1(b)(3), finding that GEICO litigated the action in bad faith. Bad faith is demonstrated where the party presenting the claim is affirmatively operating with furtive design or ill will. Dunno v. Rasmussen, 980 N.E.2d 846, 851 (Ind. Ct. App. 2012); see also Auto-Owners Ins. Co. v.

---

[5] We note that the court's order is thirty-two pages in length and contains forty-nine findings and 103 conclusions, as well as sixty-two footnotes. Relevant provisions will be included below.

C & J Real Estate, Inc., 996 N.E.2d 803, 805-806 (Ind. Ct. App. 2013) ("[P]roving bad faith amounts to showing more than bad judgment or negligence: 'it implies the conscious doing of wrong because of dishonest purpose or moral obliquity. . . . [I]t contemplates a state of mind affirmatively operating with furtive design or ill will.'" (quoting Oxendine v. Pub. Serv. Co., 423 N.E.2d 612, 620 (Ind. Ct. App. 1980))).

The trial court's decision to award attorney fees under Ind. Code § 34-52-1-1 is subject to a multi-level review: the findings of fact are reviewed under the clearly erroneous standard and legal conclusions regarding whether a party litigated in bad faith are reviewed *de novo*. See Dunno, 980 N.E.2d at 851 (citing Purcell v. Old Nat. Bank, 972 N.E.2d 835, 843 (Ind. 2012)). Finally, the trial court's decision to award attorney fees and any amount thereof is reviewed for an abuse of discretion. Id. A trial court abuses its discretion if its decision clearly contravenes the logic and effect of the facts and circumstances or if the trial court has misinterpreted the law. Id.

### DISCUSSION

We begin with the relevant portions of the court's March 21, 2013 Order which were not covered in the facts section above as follows:

> Before addressing the merits, the Court notes that litigation is not a game. It is the time-honored method of seeking the truth, finding the truth, and doing justice. When, as here, counsel consciously declines to disclose evidence to opposing counsel or contact opposing counsel to discuss inflammatory evidence, the principles of fundamental fairness are abandoned. The little voice in every attorney's conscience that murmurs *turn over all information* was admittedly and consciously ignored.

> ***Findings of Fact***

> * * * * *

8

31.     Defense counsel admitted on the record that he intentionally decided not to disclose this information after conducting research into his duty to disclose.  Defense counsel stated, "We looked very aggressively for any obligation to disclose it; there was none.  We knew if we disclosed it there would be a whole preparation on getting around it.    This is substantive evidence.  There was no written discovery that called for this, there was – we're not using it as an exhibit, there was no obligation to disclose something that we found in a public record on the internet."

\* \* \* \* \*

39.     Outside the presence of the jury and in response to Plaintiffs' Motion for a New Trial, Defendant's counsel argued that the question posed to Dr. O'Mailia was not intended to attack the credibility of any witness.  Defendant asserted that the question was properly admissible for substantive purposes independent of impeachment.  Defendant argued that the first purpose was to demonstrate that Dr. O'Mailia's arrest on charges alleging controlled substance offenses was a "significant event within three months of the accident that would have had an effect on a lot of people." Defendant argued that this event, along with the potential financial harm Dr. O'Mailia's professional discipline could cause to Plaintiff's household, was an "alternative explanation" for the cause of Mrs. O'Mailia's problems and behavior that a number of witnesses attributed to her traumatic brain injury.   Defendant intended to reference the materials alleging Dr. O'Mailia's professional misconduct in order to discuss specific medications that had allegedly been mis-prescribed to Mrs. O'Mailia, apparently to establish that she had pre-existing medical conditions that were the same or similar to conditions she claimed were caused by her brain injury.

\* \* \* \* \*

### Conclusions of Law

### Failure to Inform Opposing Counsel

27.     The parties agree that disclosure was not required by the Rules of Procedure.

28.     Plaintiff argues that Defense counsel engaged in misconduct under T.R. 60(B)(3) in that the nondisclosure constituted a violation of the Rules of Professional Conduct – 3.4(e), the Indiana Rules of Evidence 103, the Pre-Trial Order, and the spirit of the Court's *in limine* rulings that demanded that both counsel behave as professionals.

9

29. Indiana courts have addressed counsel misconduct in several cases.

30. Although the conduct of the attorney is in technical compliance with the Trial Rules, it can nonetheless be unacceptable under the Rules of Professional Conduct.

31. The Court in *Smith*, pointed out "[t]he Rules are guidelines for lawyers and do not spell out every duty a lawyer owes to clients, the court, other members of the bar and the public . . . [the] lawyers' duties are found not only in the specific rules of conduct and rules of procedure, but also in courtesy, common sense and the constraints of our judicial system. As an officer of the Court, every lawyer must avoid compromising the integrity of his or her own reputation and that of the legal process itself."

32. The Court begins by examining the Rule of Professional Conduct 8.4(d), which states that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice. The administration of justice requires counsel to avoid trial by ambush.[6]

33. The Court finds counsel's conscious decision not to disclose this information was a breach in professionalism and courtesy and was prejudicial to the administration of justice.

34. Defense counsel had the information over a week before trial began and made a conscious decision not to disclose this information to explicitly gain an advantage at trial. There is no doubt a failure to disclose this information constituted an attempted trial by ambush. Trial by ambush is prejudicial to the administration of justice and should not be condoned. This sort of conduct is not beneficial to a determination of the merits, is unfair to opposing counsel, the Court, the Jury and to the chosen profession of attorneys. Further, it necessitated an extended delay in an already long trial leaving eight (8) citizens in a jury room for a long period of time. Counsel cannot engage in this conduct disguised as "a strategic decision."

\* \* \* \* \*

## *Costs*

81. Plaintiff asks this Court to award costs and attorneys fees under T.R. 59(I) and I.C. §§ 34-52-1-1(b).

---

[6] *See Outback Steakhouse of Florida*, 856 N.E.2d at 76.

83.     As the Court is not granting a new trial, the Court DENIES this request for costs under T.R. 59.

84.     Indiana follows the American Rule, wherein each party is responsible for the payment of their own legal fees and costs in civil actions, and there are very limited exceptions to this rule.

85.     I.C. §[] 34-52-1-1(b) allows the Court to award attorney's fees as part of the cost to the prevailing party, if the Court finds that either party litigated the action in bad faith.

86.     The Court's power in equity to grant attorneys fees must be guided by a fair balancing of the litigant's access to court, deterring unnecessary and unwarranted litigation and allowing an attorney to advocate for their client.

87.     Analyzing the purpose of Indiana Code section 34-52-1-1, our Supreme Court noted that the statute "strikes a balance between respect for an attorney's duty of zealous advocacy and 'the important policy of discouraging unnecessary and unwarranted litigation.'"

88.     A claim is litigated in "bad faith," for the purposes of [the] statute permitting the award of attorney fees for bringing or pursuing a frivolous claim, if the party presenting the claim is affirmatively operating with furtive design or ill will.

89.     "[T]he absence of good faith is bad faith, but bad faith is not simply bad judgment or negligence.  Rather, it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity.  It is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will."

90.     "[T]he conduct must be 'vexatious and oppressive in the extreme.'  The reason for such a strict standard is that the nature of an attorney fee award under the bad faith exception is punitive and designed to reimburse a prevailing party who has been dragged into baseless litigation and thereby subjected to great expense."

91.     In asking an inadmissible question in front of the jury, here the Court is faced with a situation where the attorney believed the evidence presented to be admissible in one form or another.  The Court interprets the above standard to be subjective, based on the intent of counsel.  Therefore,

even though the Court concluded that this question was not reasonably admissible, counsel's belief that it was denies ill will as to the presentation of the issue to the jury. While perhaps poor judgment, the Court does not find it to be in bad faith.

92. Next, the Court evaluates counsel's decision not to disclose this information. As discussed above, the Court concluded this action was prejudicial to the administration of justice and misconduct under T.R. 60(B)(3). Further, counsel states that he did not disclose this information because it would have led to ". . . the whole getting around it." This is an affirmative furtive design. Further evidence of this furtive design is shown by the extent of the argument supporting Defendant's decision not to disclose. The concealment was on purpose here to scupper Plaintiff's trial preparation. Plaintiff was denied the opportunity to examine the nearly half inch of paperwork presented on the issue, to prepare an effective examination of witnesses or dismiss the loss of consortium claim before trial.

93. The Court finds this purpose particularly telling. It is counsel's responsibility to fairly present a case. Counsel's plan flouted this responsibility to obtain trial advantage and demonstrates a scheme contrary to our system of justice. The Court therefore concludes that this decision was made in bad faith.

\* \* \* \* \*

96. Noting that "[t]he statute vests discretion in the trial court to award fees on finding one or more acts described in subsection (b)," the Court awards reasonable attorneys fees to Plaintiff. The Court finds that based upon the identifiable conduct noted herein, counsel for Defendant should pay Plaintiffs' attorney fees associated with the time and expense associated with Plaintiffs' motion for a new trial, oral argument and proposed findings of fact tendered by Plaintiff. . . .

Appellant's Appendix at 23-24, 29-30, 32-34, 38-40, 48-51 (footnotes omitted).[7]

GEICO begins its argument by observing that it did not have a duty do disclose

the Florida Information under the Indiana Rules of Evidence, specifically Ind. Evidence

---

[7] At the end of the order, the court included a number of conclusions of law noting its dissatisfaction with the conduct of both parties' counsel, specifically stating that "Counsel have the responsibility to act civilly and professionally as officers of the Court" and noting examples where counsel did not live up to this responsibility, and it concluded by stating: "Counsel are admonished that such behaviors shed a negative light on the profession." Appellant's Appendix at 51-52.

Rules 609 and 404.[8]  GEICO argues that the court erred in concluding that Ind. Professional Conduct Rule 8.4 gave rise to a duty to disclose.  GEICO posits that unlike the conduct of attorneys featured in previous cases ruling against an attorney based upon Rule 8.4, "[n]ot informing an opposing party's attorney of information known by the opposing party and that is not subject to an independent disclosure requirement neither precludes judgment on the merits nor leads to inaccurate results."  Appellant's Brief at 19.  GEICO also argues that the trial court's application of Rule 8.4 creates a conflict with other rules, and "[t]his Court should not find that Professional Conduct Rule 8.4 creates a duty to automatically disclose information when the clear text of Rule 26, which specifically discusses the duty to disclose, indicates that no such duty exists."  Id. at 21.  GEICO also notes that "such an obligation would also contradict the principles" denoted in Ind. Evidence Rules 609 and 404.  Id.

GEICO argues that it did not litigate in bad faith, and it points to the fact that it researched whether it had a duty to disclose and decided that there was none.  GEICO further states that past cases have found misconduct when an attorney failed to supplement answers to discovery or failed to answer written discovery, but that is not the situation here.  GEICO asserts that "parties have an obligation to avoid being ambushed by using discovery to initiate the obligation to disclose information," and, at the very least, past cases and Indiana's Trial Rules and Rules of Evidence provided "a good faith belief that it was not required to disclose that its investigation had uncovered" the Florida Information.  Id. at 26-27.

---

[8] Although the court did not base its conclusions on the Indiana Trial Rules, GEICO discusses in depth the absence of a duty to disclose under said rules.

The O'Mailias argue all of the cases cited by GEICO "involve a trial court's ruling either granting or denying a new trial or granting or denying some form of sanction for a discovery violation" and that none of them "involves a trial court's finding of misconduct and bad faith despite technical compliance with the rules when the bad faith is based on how counsel employed the rules to breach the duties of common courtesy, professionalism, and avoiding prejudice to the administration of justice." Appellees' Brief at 18. The O'Mailias contend that GEICO's focus on the Indiana Trial Rules and Rules of Evidence is misplaced because the court found that GEICO's counsel's "actions were a breach of professionalism and courtesy and were prejudicial to the administration of justice." Id. at 19. The O'Mailias direct our attention to the case of Smith v. Johnston, 711 N.E.2d 1259, 1263-1264 (Ind. 1999), in which the Indiana Supreme Court set aside a default judgment on a medical malpractice case where plaintiff's counsel did not notify an attorney who had represented the physician before the medical review panel despite the fact that Ind. Trial Rule 5(B) requires only that an attorney serve an opposing party's attorney with notice of a pending default after an attorney has entered an appearance with the trial court. The O'Mailias further assert that the court's findings and conclusion that GEICO's counsel acted in bad faith are supported by the record and accordingly are not clearly erroneous, noting that the phrasing of the question was improper for impeachment purposes because "it was not limited to a conviction," that GEICO's counsel then changed its argument "to assert that the information was being offered as substantive evidence," and that following the asking of the question and discussion with counsel outside the presence of the jury, the court gave the O'Mailias the option to admonish the

14

jury which the O'Mailias declined, "preferring to simply move on and not ring the bell again." Id. at 25. The O'Mailias maintain that the court was in the best position to determine whether counsel acted in bad faith, that the court issued a "very comprehensive and detailed order setting forth the reasons it imposed sanctions on GEICO," and that this court should not set aside such order. Id. at 29.

In its reply brief, GEICO notes that "[t]he O'Mailias concede that GEICO had no obligation to disclose the information it discovered" and argues that "the decision to not disclose was not prejudicial to the administration of justice and did not violate Indiana's Rules of Professional Conduct." Appellant's Reply Brief at 2. GEICO maintains that its "decision to not disclose . . . was not merely permitted by Indiana's Trial Rules; the Trial Rules, decisions of this Court, decisions of the Indiana Supreme Court, decisions of courts from other jurisdictions, and Indiana's Rules of Evidence all affirmatively made clear that GEICO had no duty to disclose the information." Id. GEICO quotes the Preamble to the Rules of Professional Conduct and argues that although they "encourage a courteous attitude," the Rules "specifically do not require attorneys to take or forego action that, in an attorney's reasonable professional judgment, protects a client's interest." Id. at 5. GEICO posits that finding the Rules of Professional Conduct create discovery obligations "would create substantial confusion and uncertainty for attorneys and would establish the automatic duty of disclosure that the Supreme Court has held did not exist. Id. at 6 (citing Outback, 856 N.E.2d at 74-75 ("Indiana's Trial Rules, like earlier versions of the federal rules, do not require automatic disclosure of discoverable information.")). GEICO also notes that the record establishes not that it "changed its

15

position on the purpose of the evidence after the Court expressed its opinion," but rather that it "took the position at trial that the evidence was admissible for impeachment and for substantive purposes." Id. at 8.

## DECISION

Initially, to the extent that the parties argue about how GEICO's *question* to Dr. O'Mailia was phrased and whether it was offered for substantive reasons, for impeachment purposes, or both, we note that such discussion is immaterial to the question before us. The court in its March 21, 2013 Order specifically concluded that GEICO subjectively believed that the question was admissible which belied ill will on its part as to the presentation of the issue to the jury. The court specifically stated in Conclusion 91: "While perhaps poor judgment, the Court does not find it to be in bad faith." Appellant's Appendix at 49. The court did not base its award of attorney fees on GEICO asking the question, and accordingly we need not determine whether the court abused its discretion in this regard.[9]

Indeed, despite the multitude of issues discussed in its order, the court found bad faith only with regard to GEICO's decision not to disclose the Florida Information. As

---

[9] In its March 21, 2013 Order, the court concluded that the question asked on cross-examination to Dr. O'Mailia that "[i]sn't it true that on July 20th of 2009, you were arrested and charged in the Circuit Court of Leon County in Florida with thirteen counts of violating section 89 – or 893.137a of the Florida statutes by obtaining controlled substances by fraud," ran afoul of Ind. Professional Conduct Rule 3.4(e). Transcript at 188. Rule 3.4(e) provides in part that "A lawyer shall not . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence . . . ." The court concluded that the question as phrased "was *not an appropriate impeachment*," that "counsel could not have reasonably concluded that asking about multiple inadmissible elements fit cleanly within allowed impeachment," that GEICO "made it abundantly clear that counsel's intention was not to use this as impeachment, but for substantive evidence" but that the substance of the question did not fit within the Pretrial Order and was accordingly outside the scope of the contentions GEICO submitted, and that it constituted misconduct under Ind. Trial Rule 60(B)(3). Appellant's Appendix at 41-42. However, the court also concluded that the circumstances surrounding the question did not constitute litigating in bad faith, and it did not award attorney fees on that basis.

noted above, the court concluded that this failure to disclose ran afoul of Ind. Professional Conduct Rule 8.4(d), which provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." The court later concluded that this breach of professional conduct constituted misconduct under Ind. Trial Rule 60(B)(3), which provides in relevant part that "[o]n motion and upon such terms as are just the court may relieve a party or his legal representative from a judgment . . . for the following reasons . . . fraud . . . misrepresentation, or other misconduct of an adverse party." However, instead of granting the O'Mailias' motion for a new trial based thereon it merely awarded attorney fees "associated with the time and expense associated with Plaintiffs' motion for a new trial, oral argument and proposed findings of fact tendered by Plaintiff" under Ind. Code § 34-52-1-1(b)(3). Id. at 50-51.

Also noted, a finding of bad faith requires not mere negligence or bad judgment, but rather the conscious doing of wrong because of dishonest purpose or moral obliquity, or affirmatively operating with furtive design or ill will. Here, GEICO's counsel argued to the court that they "looked very aggressively for any obligation to disclose it; there was none." Transcript at 194. They noted that written discovery did not call for such materials, and stated that "there was no obligation to disclose something that we found in a public record on the internet." Id. at 195. After the O'Mailias moved for a mistrial, Attorney Ice offered the following explanation for why GEICO decided not to disclose the Florida Information:

> Our position when we discovered this – we tried to determine whether there was a duty to disclose. There were absolutely no written discovery requests to us at that point that required disclosure. Furthermore, there's nothing under the Trial Rules that required disclosure. We

17

evaluated every obligation that was made on us either by the rules of this court, of this state, or the pleadings in this case; we determined there was no duty to disclose. We opted not to disclose that information. It is our position that there is no duty to disclose this information.

By comparison is that in the same way that [the O'Mailias' counsel] is not going to share with me his cross examination of Dr. Horn in this case, I have no duty to provide my cross examination of Dr. O'Mailia in this case. . . .

Id. at 201.

These statements by GEICO's counsel lead us to conclude that the decision not to disclose the Florida Information was not borne out of ill will, and was not dishonest or immoral, but instead was strategic in nature and believed to be within the bounds of the law. Indeed, the O'Mailias, as well as the court, agree with the results of GEICO's research that neither the Trial Rules nor the Rules of Evidence compelled GEICO to disclose the information, nor has case law been uncovered imposing such a duty. We cannot say that such circumstances are indicative of litigating in bad faith.

Also, we note that the court based its bad faith finding in part on its conclusion that GEICO's intended use of the Florida Information was purely substantive in nature and that it was only after the fact they argued that the evidence was relevant for impeachment purposes. Our review of the record reveals otherwise. As noted, directly following the O'Mailias' objection and brief bench conference, attorney Ramsey stated that in Florida a conviction is entered following a plea of nolo contendere, that "fraud is a crime of dishonesty," and that accordingly "it fits squarely within 609(a)." Id. at 194. Attorney Ice then explained further that "there is this whole issue that's going on, a stressor in this family that affects how they're relating to each other and stress and

18

anxiety that [Cheryl] is experiencing," that "having your husband arrested and charged in a criminal court is a highly stressful ordeal," and that therefore "there is this purpose *that's beyond impeaching him* as having been convicted of a crime of dishonesty." Id. (emphasis added). The record reveals that GEICO intended at the outset to use the Florida Information to impeach Dr. O'Mailia's credibility under Ind. Evidence Rule 609(A), and therefore Finding 39 is clearly erroneous.

Also, the fact that GEICO intended to use the Florida Information for impeachment purposes belies a finding of bad faith. Ind. Evidence Rule 609(b) requires that an adverse party be notified of a party's intent to use evidence of a criminal conviction for impeachment under the rule only if "more than ten (10) years have passed since the witness's conviction or release from confinement for it, whichever is later," and the parties agree that the convictions at issue here were less than ten years old. Thus, to the extent GEICO intended to impeach Dr. O'Mailia using the Florida Information, we cannot say that not disclosing such evidence was the product of furtive design or ill will necessitating a finding of bad faith.

Further, to the extent the O'Mailias suggest that Smith v. Johnston controls the outcome of this case, we find Smith to be distinguishable. In Smith, plaintiff Johnston filed a medical malpractice claim against Dr. Smith with the Indiana Department of Insurance in which Dr. Smith was represented by the law firm Locke Reynolds Boyd & Weissell ("Locke Reynolds"). 711 N.E.2d at 1261. The medical review panel unanimously found that Dr. Smith failed to comply with the appropriate standards of care, and soon after counsel for Johnston, Karen Neiswinger, sent a letter to Locke

19

Reynolds demanding the policy limits in settlement. Id. After a month passed without response, Johnston filed suit in court, and later that day Neiswinger found a letter in her mail from Locke Reynolds rejecting her settlement demand. Dr. Smith and his practice were served with the complaint by certified mail, and a scrub nurse signed for the summonses. Id. Locke Reynolds did not file an appearance on Dr. Smith's behalf, and approximately six weeks after filing the complaint Johnston moved for default judgment. Id. Neiswinger did not communicate with Locke Reynolds following sending the settlement letter and did not alert Locke Reynolds of a pending default judgment motion. Id. Neiswinger also submitted a sworn affidavit to the trial court in which she stated:

> I certify that no pleading has been delivered to Plaintiffs or to their counsel by the Defendants or any attorney appearing for Defendants, nor to the knowledge of the undersigned has any attorney entered an appearance since the filling [sic] of this cause, nor has any attorney contacted undersigned regarding entering their appearance on behalf of Defendants in this case since the filing of this cause.

Id. The court granted a default judgment the next day, a damages hearing was set, and following the damages hearing the judgment was served on Dr. Smith. Id. Locke Reynolds filed an appearance six days later, as well as a notice of intent to petition to set aside the default judgment under Ind. Trial Rules 60(B)(1) and 60(B)(3). Id.

The Indiana Supreme Court held that although Neiswinger technically complied with the applicable Trial Rules, she committed misconduct under Ind. Trial Rule 60(B)(3) when she obtained a default judgment without notifying Locke Reynolds, specifically noting that "overriding considerations of confidence in our judicial system *and the interest of resolving disputes on their merits* preclude an attorney from inviting a default judgment without notice to an opposing attorney *where the opposing party has advised*

20

*the attorney in writing of the representation in the matter*." Id. at 1261-1262 (emphases added). The Court held specifically that "knowledge gives rise to a corresponding duty under the Rules of Professional Conduct to provide notice before seeking any relief from the court." Id. at 1263.

In so holding, the Court observed that there was "no doubt" that Neiswinger was on notice that Locke Reynolds was representing Smith and specifically noted that Neiswinger, following the panel proceeding before the medical review board, sent Locke Reynolds a settlement demand and received a response the same day she filed suit in the trial court. Id. The Court observed that Ind. Professional Conduct Rule 8.4(d) "explicitly states that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice," and "[t]he administration of justice requires that parties and their known lawyers be given notice of a lawsuit prior to seeking a default judgment" because "[a] default judgment is appropriate only where a party has not appeared in person or by counsel and, if there is a lawyer known to represent the opposing party in the matter, counsel had made reasonable effort to contact that lawyer." Id. at 1264. The Court also noted regarding the affidavit that although the sworn statement was "literally true . . . [,] it would be easy for a busy trial judge to take this as a statement that Neiswinger had not been contacted *at all* by Smith's attorneys, not that they had contacted her regarding settlement, but not their appearance," and accordingly although it "may not be a direct misrepresentation, [] it certainly creates a potential for misperception on the part of the trial court, and to that extent was also prejudicial to the administration of justice." Id. The Court also underscored that "[a] default judgment

21

against a health care provider or any other party is an extreme remedy and is available only where that party fails to defend or prosecute a suit. It is not a trap to be set by counsel to catch unsuspecting litigants." Id.

The attorney in Smith attempted to capitalize on a failure by Dr. Smith's scrub nurse to pass along the summons and obtain an "extreme remedy" of default judgment meant only for parties who fail to defend or prosecute a suit. In so doing, she misled the trial court as to her level of contact with Locke Reynolds and perhaps led the court to believe that Dr. Smith was not being represented by counsel. The Indiana Supreme Court labeled such conduct as prejudicial to the administration of justice. The Court noted in doing so that Neiswinger was on notice Dr. Smith was being represented and even corresponded with his counsel regarding settlement, yet she attempted to take advantage of our trial rules and obtain judgment by default rather than on the merits of her case. The other cases cited by the court in its March 21, 2013 Order similarly concern instances in which a litigant sought to set aside a default judgment. See Allstate v. Watson, 747 N.E.2d 545, 546-547, 549 (Ind. 2001) (reversing the trial court's denial of Allstate's motion for relief from default judgment where during negotiations plaintiff's counsel assured Allstate it would not seek a default judgment "while negotiations [were] still proceeding," but subsequently sought a default judgment prior to the expiration of plaintiff's offer of settlement); Sears Roebuck and Co. v. Soja, 932 N.E.2d 245, 252 (Ind. Ct. App. 2010) (affirming trial court's grant of default judgment and distinguishing Smith because Ind. Professional Conduct Rule 8.4(d) did not require plaintiff's counsel to notify a claims adjuster of his intent to pursue a default judgment, and noting that "the origin of

22

the default action is [the claims adjuster's] inattention to monitor this cause . . ."), <u>trans. denied</u>.

By contrast, GEICO never made representations to the trial court which were misleading. GEICO did not attempt to obtain the extreme remedy of default judgment, and indeed the court presided over a jury trial on the merits. GEICO discovered information on the Internet which was publically available and which it intended to use at trial to cross-examine Dr. O'Mailia. The O'Mailias do not challenge GEICO's argument that Dr. O'Mailia knew the substance of the Florida Information, and again GEICO was under no duty to disclose under the Indiana Trial Rules or Rules of Evidence. Thus, rather than setting a trap to ensnare the O'Mailias and avoid having a trial on the merits, GEICO came across certain publically-available information known by the opposing party which it used on cross-examination. We cannot say that GEICO's conduct arises to the level found in <u>Smith</u> to be prejudicial to the administration of justice, and, in any event and as discussed above, was not the product of litigating in bad faith.

Finally, we find the instant circumstances distinguishable from those present in <u>Outback Steakhouse of Fla. v. Markley</u>, 856 N.E.2d 65 (Ind. 2006). In <u>Outback</u>, William Whitaker attended a grand opening event at an Outback Steakhouse in Muncie, Indiana, in which alcoholic drinks were provided either free of charge or at a rate of ten cents per drink. 856 N.E.2d at 70, 71 n.4. Whitaker left the event, went to a bar, and later severely injured David and Lisa Markley when he crashed into a motorcycle they were riding. <u>Id.</u> at 70. Patrice Roysdon, a waitress working the event that evening, visited the counsel for the Markleys, Michael Alexander, at Alexander's request, and she told Alexander that

Whitaker was visibly intoxicated when she served him that evening. Id. The Markleys sued Outback, and during discovery Outback served the Markleys with interrogatories including Interrogatory 12 asking the Markleys to "[s]tate specifically each and every fact upon which you rely to support your allegation . . . that [Outback] . . . provided alcoholic beverages to . . . Whitaker with actual knowledge that he was visibly intoxicated . . . ." Id. The Markleys' response identified several individuals but did not mention Roysdon. Id. Outback deposed Roysdon in which she testified that "Whitaker was not visibly intoxicated at Outback." Id. at 71. She did not indicate that she had ever spoken with the Markleys' counsel, and only the Markleys' co-counsel, Donald McClellan, was present at the deposition. Id. Trial commenced in which Roysdon was identified as a witness by Outback but not by the Markleys, but the trial ended in a mistrial due to circumstances unrelated to Roysdon. Id.

A second trial began in which Outback subpoenaed Roysdon to testify, and during Outback's opening statement it "told the jury Roysdon would testify that Whitaker was not visibly intoxicated and that no witness would be produced who would testify to the contrary." Id. On the Friday of the first week of trial, still in the presentation of the Markleys' case-in-chief, Roysdon called Alexander's office and arranged an appointment for Sunday, and at the appointment she "told him she had lied in her [] deposition and that she planned to testify at trial that Whitaker was visibly intoxicated when she served him." Id. Roysdon did not communicate this to Outback or its counsel, and Alexander "did not inform the trial court or Outback of this meeting or seek to supplement the plaintiffs' answer to Interrogatory 12." Id. Roysdon was called by Outback and testified

24

"that Whitaker was visibly intoxicated at Outback, that she continued to serve him after she realized he was intoxicated, and that she felt guilty and responsible for the collision." Id. at 71-72. The jury ultimately returned a verdict in the Markleys' favor with damages totaling $60 million. Id. at 72. Outback moved for a new trial and post-trial discovery was conducted related to Roysdon's shift in testimony, but the trial court denied all post-trial relief. Id.

On transfer, the Indiana Supreme Court, citing to Smith and Allstate, observed that "'misconduct' under Indiana's Rule 60(B)(3) can be based on a violation of the Code of Professional Responsibility, even if the conduct at issue does not violate the rules of civil procedure," and noted that both intentional or unintentional violations of the discovery rules could constitute misconduct. Id. at 73. Outback argued that the Markleys' "failure to disclose Roysdon's identity and the substance of her 1997 statement in response to Outback's 1999 interrogatories violated Indiana Trial Rules 26 and 33" and that "Alexander's failure to inform Outback that he intended to call Roysdon and that she would recant her 2001 deposition testimony at trial violated the duty to supplement discovery responses under Trial Rule 26(E)." Id. at 74. The Court concluded:

> [T]he [Markleys'] failure to identify Roysdon as a person with knowledge of the relevant facts was a negligent if not intentional breach of its discovery obligations. Subsequently, [the Markleys] failed to supplement their response with the substance of her change in testimony. As these events unfolded, these omissions cascaded into a closing argument that materially misled the jury. The cumulative effect was misconduct prejudicing Outback's defense.

Id.

25

Here the parties agree that GEICO did not violate the rules of discovery. There was no interrogatory or other tool of discovery related to the Florida Information, and accordingly GEICO was under no duty to supplement its discovery under Ind. Trial Rule 26(E). Under the circumstances, in which GEICO was not under a duty to disclose the Florida Information and it researched the scope of its duty to disclose before deciding not to do so, we conclude that GEICO did not litigate in bad faith. Accordingly, we reverse the trial court's attorney fee award under Ind. Code § 34-52-1-1(b)(3).[10] Cf. Flynn v. Edmonds, 602 N.E.2d 880, 888-889 (Ill. App. Ct. 1992) (discussing a rule of professional conduct requiring a lawyer to "promptly" reveal a fraud to the tribunal where the lawyer "knows that a person other than the client has perpetrated a fraud upon a tribunal," and holding that the rule "does not require an attorney to disclose the possibility that a witness might lie on the stand," that "[a]ny defense counsel, in situations such as this, is in a difficult position" because "[i]f they disclose the impeaching information before trial, they can rest assured that the falsely testifying witness will never appear or will testify truthfully on the point that could be subject to impeachment" but "[t]hat is not to say that the same witness will be equally candid with the balance of his testimony," and that "the burden of obtaining truthful witnesses should rest upon those who are calling those witnesses").

---

[10] As noted above, the O'Mailias request that we award appellate attorney fees in their favor pursuant to Ind. Appellate Rule 66(E). Appellate Rule 66(E) provides in part that this court "may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees." Having concluded that GEICO did not litigate in bad faith below and ruled in GEICO's favor, we decline the O'Mailias' request.

CONCLUSION

For the foregoing reasons, we reverse the court's award of attorney fees under Ind.

Code § 34-52-1-1 and deny the O'Mailias' request for appellate attorney fees.

Reversed.

ROBB, J., concurs.

BARNES, J., concurs with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

GEICO GENERAL INSURANCE COMPANY,   )
  )
    Appellant-Defendant,   )
  )
      vs.   )   No. 20A04-1307-CT-325
  )
LAURA B. COYNE, CHERYL A. O'MAILIA,   )
and JAMES O'MAILIA,   )
  )
    Appellees-Plaintiffs.   )

**BARNES, Judge, concurring**

I concur with the majority that the award of attorney fees be reversed. I do so with some hesitation, though, because I believe that trial by ambush and rabbit-out-of-the-hat moments are not to be favored in our courtrooms.

I admit that exhausting, sometimes tedious discovery is the norm in today's litigation. It is preferable that both sides fully disclose their evidence. Nothing GEICO did here violated any of our procedural rules, however. The trial court agreed with GEICO's attorneys that they had no duty under those rules to disclose the information they found. It is hard to find "bad faith" under such circumstances, although I would not say it is necessarily impossible to find "bad faith" just because a party has technically complied with the discovery provisions of the Indiana Trial Rules.

28

Whether or not I am put off by the conduct here is not the question. Was this conduct over the ethical line? I come to the conclusion that it was not. The information here was publically available to anyone who would search it out. Most crucially, it was well-known to the O'Mailias themselves, but they apparently failed to tell their own attorneys about James's legal troubles near the time of the accident. James's responses to the cross-examination questions were ones that legitimately triggered the impeaching question based on that information. Given these facts, I reluctantly vote to concur.